# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

Orlando Division

*FILED*

*2017 JAN -9 PM 2:29*

*US DISTRICT COURT*
*MIDDLE DISTRICT OF FLORIDA*
*ORLANDO, FLORIDA*

6:17-cv-34-ORL-40DCI

|  |  |  |
|---|---|---|
| Aneurin Adlai Lavalle | ) | Case No. |
| *Plaintiff,* | ) | _____ |
|  | ) | *(to be filled in by the Clerk's Office)* |
| -v- | ) | |
|  | ) | Jury Trial: *(check one)* ☒ Yes ☐ No |
| National Exemption Service, LLC; ABS USA | ) | |
| International, LLC;  Kunert Realty, Inc.; Andreas | ) | |
| Kunert; Bimal Fernando & Does & Roes 1 - 50 | ) | |
| *Defendants.* | ) | |
|  | ) | |
|  | ) | |
|  | ) | |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT; FLORIDA'S CONSUMER COLLECTION PRACTICES ACT; THE TELEPHONE CONSUMER PROTECTION ACT; DECLARATORY JUDGMENT; FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT; FRAUD IN THE INDUCEMENT; BREACH OF CONTRACT; PROMISSORY FRAUD; FRAUDULENT MISREPRESENTATION; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; & NEGLIGENT MISREPRESENTATION**

## I.     PARTIES TO THIS COMPLAINT

### A.     **The Plaintiff**

1.      Aneurin A. Lavalle a/k/a Nye Lavalle (hereinafter "Plaintiff" or "Lavalle") is a 59 year-old male caretaker for his 87 year-old widowed, handicapped and disabled mother ("Matilde Pew" or "Pew") that resides at 155 So. Court Avenue, Unit 2404, Orlando, Florida 32801 with a mailing address of 424 East Central Blvd. #119, Orlando, FL 32801 and an email address of mortgagefrauds@aol.com

### B.     **The Defendants**

1.      Defendant National Exemption, LLC  (hereinafter "NES") is a Florida Limited Liability Company that acts as a "debt collector" as defined in Section 803(6) of the FDCPA, 15 U.S.C. § 1692a(6) whose principal and mailing address is 604 Packard Court, Ste. A, Safety Harbor, FL 34695 that can be served by its registered agent is Gerald P. Baker, located at 604 Packard Court, Ste. A, Safety Harbor, FL 34695.

2.      Defendant ABS USA INTL LLC (hereinafter "ABS" or "ABS USA Int'l.)" is a Florida Limited Liability Company with a principal and mailing address of 135 Algonquin Dr., Mississauga, ON L5H 1-P3 CN that can be served by its registered agent Roger A Nutt located 845 N Fern Creek Ave., Orlando, FL 32803.

3.      Defendant Bimal Fernando (hereinafter "Fernando") is an individual who resides at 135 Algonquin Dr., Mississauga, ON L5H 1-P3 CN and alleges to own property in Orlando,

Florida and is the principal and director of Defendant ABS USA INTL LLC.

4.    Defendant Kunert Realty, Inc. is a Florida Corporation located at 1540 International Parkway, Suite 2000, Lake Mary, FL 32746 whose principal and registered agent is Andreas Kunert located at 1540 International Parkway, Suite 2000, Lake Mary, FL 32746.

5.    Defendant Andreas Kunert is a real estate agent and principal of Defendant Kunert Realty, Inc. and an alleged agent for Defendants ABS USA INTL LLC and Bimal Fernando.

6.    Defendants Does and Roes 1 to 50 are presumed to be agents, attorneys, associations, managers, entities and natural persons who have conspired together to tortuously act in interfering with Plaintiff's due process rights to litigate his claims in order to conceal the enormity of the fraudulent financial scheme being perpetrated by Defendant NES and other similar companies across America.

## II.    JURISDICTION & VENUE

A.    Jurisdiction arises under 28 U.S.C. § 1331. Specifically, included in the Counts stated herein are claims arising under Sections the Fair Debt Collection Practices Act ("FDCPA"), as amended by Public Law 111-203, title X, 124 Stat. 2092 (2010) §§ 805 (b); § 807 (2) (A) & (B) (8, 10, & 11); 808 (1 & 7); and § 809 (a) (3 – 5) and an action arising under the Telephone Consumer Protection Act 47 U.S.C. § 227.

B.    Venue is proper since the subject properties are located in this district; each defendant conducts business in this district; the torts complained of occurred in this district; and Defendants Fernando and ABS USA and Int'l. allege to own property in this district.

What is the basis for federal court jurisdiction? *(check all that apply)*
    ☒ Federal question          ☐ Diversity of citizenship

3

### III.   CONCISE STATEMENT OF CLAIMS

A.   The acts complained of herein deal with the occupancy of two condominium units (#'s 2208 and 2403) ("Subject Properties") occupied by an elderly, infirmed, handicapped, and disabled 87 year-old woman ("Pew") and her almost 60 year-old caretaker son ("Plaintiff") who upon exhaustive research and investigation made agreements with Defendants Kunert, Kunert Realty, and later Fernando to occupy the Subject Properties on an annual renewable basis with an option to purchase and/or option to enter into an agreed upon financing mortgage arrangement with Defendant Fernando if the building's HOA ceased to allow occupancy of the Subject Properties to non-owners.

B.   To date, Defendants Kunert, Kunert Realty, and Fernando have been paid over $57,500.00 USD per the agreements reached.

C.   Based on the representations and agreements of Defendants Kunert, Kunert Realty, and Fernando, Plaintiff made significant improvements at a cost of several thousand dollars to Unit 2403 upon the premise that this would be Plaintiff's residence for many years and Pew would occupy her unit until she could no longer live independently or upon her death.

D.   Immediately upon Plaintiff's residency in the Subject Units, he began to receive "collection postcards" for collection of past due utility bills in the hundreds of dollars in his name.

E.   It was learned many months later, the bills that were for the year prior to Plaintiff's residency that included unknown and non-contracted for water and sewer charges, late fees, finance fees, and even fees for sending collection letters for a year prior to his occupancy.

F.   Due to Plaintiff's professional experience, he became suspect of such bills and predatory practices that were identical in scheme and reminiscent of the predatory mortgage servicing practices Plaintiff had identified over three-decades earlier.

G.    Plaintiff contacted Defendant NES to complain and dispute the bills and to breakout the months of bills and explain the various charges and how he could be late on a payment since he just moved in and have a bill of several hundred dollars for weeks of limited water usage since Plaintiff moved into Unit 2403 late in February of 2015.

H.    The NES collection postcards did not reflect the information Plaintiff required to ascertain what he owed, since they only contained a demand for payment of the past month's alleged metered water usage, sewer charges, a finance fee of $2.16 each month and a $15.00 late fee.

I.    In fact, the total finance fee and late charge of $17.16 were often twice the amount of the actual water and sewer charge.

J.    Plaintiff understood the voluntary payment doctrine and could not on good conscious pay such bills in his fiduciary responsibility to his mother and her trust.

K.    As such, he kept asking on dozens of occasions of HOA management personnel and Defendant NES for support to back up their demands and claims.

L.    As for Unit 2208, again, Defendant NES started sending bills that showed the account was paid and then later sent bills reflecting misapplication of payments, even though due to the problems he identified in the Unit 2403 bills, Plaintiff did not remit payment until he learned of how each unit's utility bills were being calculated and allegedly metered.

M.    One quick calculation Plaintiff conducted for both units in the summer of 2015 reflected differing per gallon unit of water rates were being charged for the same month for the two units when the unit of measure should have been constant.

N.    Instead of responding appropriately to Plaintiff's questions and disputes, Defendant NES began harassing and hounding Plaintiff via phone, email and mail, including the mailing of postcards, for not only collection of bills he never had any obligation for, but for additional charges during his residency for fraudulently and non-contracted for finance fees, late charges and fraudulently manipulated alleged water usage measured by sub-meters wherein the rates being charged for the

same gallon units of water varied between the Subject Properties by as much as 87% for the same monthly cycle and wherein the charges for the same gallon units of water and the data and analysis detailed below reflects that the per gallon rate is not fixed and constant, save for annual or other rate adjustments, and that the monthly rate charged for 1000 gallons of water fluctuated at almost 100% from a low of $4.25 per gallon to a high of $8.16 per gallon when if true and actual sub-metering were occurring, the per gallon rate would remain constant without fluctuation from month-to-month and from unit-to-unit.

O.    In addition, non-contracted and usurious "finance fees" of $2.16 were assessed, billed and attempted to be collected from Plaintiff each month by NES that were  often as much as 40% of the actual amount charged for water and sewer.

P.    NES threatened to contact the subject unit's owners if Plaintiff did not pay the fraudulently assessed bills.

Q.    Plaintiff refused for the reasons stated herein and demanded for months, backup support for what NES claimed Plaintiff owed.

R.    On November 3, 2015, Defendants Kunert and Kunert Realty, not NES, made a request for payment of alleged "sub-metered" water and sewer utility bills upon Plaintiff for Unit 2403 and provided Plaintiff with evidence that created further questions for Plaintiff.

S.    An incomplete document sent to Plaintiff by Defendants Kunert and Kunert Realty, not Defendant NES, purported to show Plaintiff's alleged obligation to NES for Unite 2403 as shown directly below:

T.     In the alleged "accounting history" for Unit 2403, NES reflects Plaintiff as the tenant starting in March of 2014, when Plaintiff did not even view the unit, let alone move into the unit until late February of 2015.

U.     Defendant NES fraudulently inserted Plaintiff's name into a date and time for billing purposes that was virtually an entire year before Plaintiff ever viewed, let alone occupied the premises.

V.     The Sewer rate however, remained a constant but the other rates were varying in wild degrees. Again, Plaintiff voiced his disputes and concerns to Defendants NES, Kunert Realty and Kunert and voiced he would not pay such bills until he was provided how the bills were being calculated and the appropriate backup documentation so he could audit the accounts.

W.     Instead of removing the fraudulent charges from March 24, of 2014 to late February of 2015 when Plaintiff moved into Unit 2403, Defendant NES continued to harass Plaintiff with continuous collection calls to his cell phone, emails and bills still not removing the charges from March 24, of 2014 to late February of 2015 despite all Defendant's now admitted knowledge that Plaintiff did not reside in the property on those dates and was not legally responsible for payment.

X.     Yet, instead of addressing his disputes on all fronts, Defendant NES continued to churn and pyramid late fees and finance fee to their own personal benefit at the expense of the HOA and the HOA, its representatives, nor Defendants Kunert, Kunert Realty, or Fernando took care of the

7

matter and allowed NES to continue to harass the Plaintiff for an additional year.

Y.   In December of 2015, Defendant Fernando called Plaintiff a couple of times representing to personally own the units.

Z.   Fernando wanted to renegotiate the agreements reached with Defendants Kunert and Kunert Realty months in advance of its expiration wherein they reaffirmed the agreement to an annual renewal; a 3-month notice if Pew had to leave due to health reasons or death with a commitment by Plaintiff to cover 3-months of occupancy payments; a 3-month notice if Fernando was forced to sell the unit by the HOA wherein Plaintiff and Fernando would enter into a purchase and mortgage agreement as described herein so that his "cash flow" from the unit remained the same, but Plaintiff and Fernando would be in compliance with any needs of the HOA.

AA.  On December 28, 2015, Plaintiff sent Defendant NES a reply email in response to another unlawful collection request that stated: ***"one more notice from you without the requisite information I have asked for will result in a lawsuit under fair debt collection and deceptive practices act. Please govern yourselves accordingly!"*** **(emphasis added)**

BB.  On January 27, 2016, Plaintiff sent Defendant NES a reply email in response to another unlawful collection request that stated: ***"how many times do I have to tell you all to send me what I have asked for? I am tired of this crap and will sue you all for deceptive trade practices and fair debt collection violations if you do not provide the requested information I have asked for on over a dozen occasions now. Geez, how difficult is it to get me the information for each month requested?"*** **(emphasis added)**

CC.  Instead of addressing Plaintiff concerns, Defendant NES kept harassing Plaintiff and attempting to collect the unlawful, non-contracted, non-obligated and fraudulent alleged debt.

DD.  The matter escalated in late summer and fall of 2016 wherein Defendants Kunert, Kunert Realty and Fernando became involved in the collection of the unlawful, non-contracted, non-obligated and fraudulent alleged debt.

EE.    Finally, on August 3, Plaintiff received the monthly billing statements from NES and upon a cursory review, Plaintiff's suspicions of NES' predatory, fraudulent, and abusive billing schemes and collection practices became even more apparent.

FF.    Plaintiff informed Defendants Kunert and Kunert Realty that he did not owe the prior tenant's charges for over a year and the bills were fraudulent and that he would take care of the matter and asked Defendant's Kunert and Kunert Realty not to interfere or demand any payment since the matter most likely after his further research he planned to conclude by the holidays, would result in a Federal lawsuit against NES for the acts complained about herein.

GG.    Instead of abiding by Plaintiff's wishes, Defendants Kunert, Kunert Realty and Fernando began harassing and pestering Plaintiff to collect on what they knew was an unlawful bill and especially for any lawful utility charges, if owed, by the prior resident of the unit from March of 2014 until when Plaintiff moved in late February of 2016.

HH.    On information and belief and after time for proper document and electronic discovery, Defendants Does and Roes 1 – 50 were providing Defendants Kunert Realty, Kunert and Fernando with directions, guidance, information and strategy to deal with Plaintiff's threat of a lawsuit against NES since discovery in such a lawsuit would open a Pandora's Box of fraud similar to the one discovered by Plaintiff of predatory mortgage servicing.

II.    Plaintiff was in discussions with nationally renowned Class Action and Qui Tam counsel for this and other matters he was working on that were involved in the National Mortgage Settlement with the DOJ, servicers and banks.

JJ.    Defendants Kunert Realty and Kunert, at the direction of Defendant Fernando, then threatened Plaintiff and Pew with eviction if they did not pay Defendant Kunert Realty or Defendant NES the unlawful, non-contracted, non-obligated and fraudulent alleged debt.

KK.    Plaintiff informed them to stay out of it and don't pay and not to threaten Plaintiff with such nonsense and that Plaintiff would take care of the matter.

LL.   At no time did take care of the matter mean that Plaintiff would pay the unlawful, non-contracted, non-obligated and fraudulent alleged debt, especially any lawful debt obligated by others.

MM.   The harassment and threats of Defendants Kunert Realty, Kunert, and Fernando continued when they each had full, complete and admitted knowledge that at minimum, as they admitted, Plaintiff did not owe the NES charges from March 24, 2014 to the date of his move-in.

NN.   Despite warnings not to pay NES nor interfere in the matter and to let Plaintiff handle the legal matter and claims Plaintiff had, Defendant Fernando directed ABS USA Int'l. to pay the unlawful, non-contracted, non-obligated and fraudulent alleged debt.

OO.   Recent research indicates that it is Defendant ABS USA Int'l, not Defendant Fernando, that owns each of the subject units.

PP.   Defendant Fernando then directed Defendants Kunert and Kunert Realty to threaten Plaintiff and his elderly, disabled and handicapped 87 year-old mother with eviction if they didn't pay the unlawful, non-contracted, non-obligated and fraudulent alleged debt.

QQ.   This despite the fact that they have been paid over $57,500.00 in monthly occupancy payments.

RR.   While Plaintiff paid the agreed upon monthly occupancy payments, he refused to pay the unlawful, non-contracted, non-obligated and fraudulent alleged debt.

SS.   In late November of 2016, despite their agreement a year earlier, Defendants Kunert, Kunert Realty and Fernando delivered an alleged notice to vacate in violation of their previously reached agreements per terms of an alleged undisclosed lease with Fernando.

TT.   Plaintiff to date, over the last two years has spent over 100 man hours dealing with this matter; suffered from anxiety and sleepless nights; suffered increased muscle tension; suffered from increased inflammation of his joints; had to deal with his elderly mom's depression and anxiety of her possible loss of residence; has not been able to adequately devote time to Pew; and neglected the property in Boca Raton due to the issues raised in this lawsuit.

## IV.    RELEVANT, PERTINENT & KEY BACKGROUND ON PLAINTIFF

A.    Due to the nature of this action, details about Plaintiff's experience, expertise and understanding of the matters contained herein may be useful for the Court's understanding.

B.    Plaintiff is a nationally recognized advocate and expert in fraudulent and predatory mortgage servicing, securitization and foreclosure practices that have been the subject of numerous articles and books wherein Plaintiff has been credited in having "*uncovered the greatest financial fraud in American history*" by New Republic Magazine and New York Times Pulitzer Award winning investigative journalist, Gretchen Morgenson wrote of Plaintiff "***Knowing what we know now, he (Plaintiff) looks more like one of the financial Cassandras of our time — a man whose prescient warnings went unheeded.***" (emphasis added)

C.    Plaintiff coined the terms predatory mortgage servicing, predatory mortgage securitization and predatory foreclosure in the nineties and is credited for creating the Produce the Note standing argument; the securitization fail/fraud scenario and the robo-signing controversy.

D.    Plaintiff's work product has been reviewed and reported on by the law firm of Baker & Hostetler for the CEO and Board of Directors of Fannie Mae as referenced in the New York Times article on Plaintiff attached as Exhibit A and the New Republic article and Chapter 4 except from the book Chain of Title attached as Exhibit B.[1]

E.    The Fannie Mae Baker & Hostetler Report attached as Exhibit C that bears Plaintiff's name states in part:

1.    It is axiomatic that the practice of *submitting false pleadings and affidavits is unlawful*.[2]

2.    *He (Lavalle) expresses fear that Fannie Mae does not have adequate procedures to protect the 15 million freely negotiable promissory notes in its portfolio. Mr. Lavalle has*

---

[1] Dayen, David. "The Originator." *Chain of Title: How Three Ordinary Americans Uncovered Wall Street's Great Foreclosure Fraud.* New York: New, 2016. 51-62. Print.
[2] Mark A. Cymrot & Amika Biggs, Report to Fannie Mae Regarding Shareholder Complaints by Mr. Nye Lavalle (May 19, 2006) (unpublished, internal report), *available at* http://4closurefraud.org/2012/02/04/oejcase-no-5595-confidential-report-to-fannie-mae-regarding-shareholder-complaints-of-foreclosure-fraud-by-mr-nye-lavalle ; *see also* Gretchen Morgenstern, *A Mortgage Tornado Warning, Unheeded,* N.Y. TIMES, Feb. 5, 2012, at BU1, *available at* http://www.nytimes.com/2012/02/05/business/mortgage-tornado-warning-unheeded.html?pagewanted=all, Page 6

*identified an important legal issue - lost notes threaten the enforceability of Fannie Mae's mortgages and expose borrowers to financial risks.*[3]

3.  *Ownership interests in mortgages are now fractured into a variety of income streams due to the advent of mortgage-backed securities ("MBS")*. No single owner would have the *means or authority to accept payments*.[4]

4.  As a result of the Florida cases, the *Legal Department is formulating a more immediate solution for the issues raised in those cases, including a directive to attorneys and servicers in Florida directing corrective action*.[5]

5.  "Masked by the improper pleadings is *a substantive legal issue of whether MERS or servicers have standing to foreclose*."[6]

6.  "Fannie Mae's policy instructs servicers and MERS to *commence foreclosure proceedings in their own names if permitted under state laws*. While this policy is based upon reasonable legal arguments and policy considerations, *the issue is not resolved in case law*."[7]

7.  It appears *unlikely that substantial numbers of borrowers* who have defaulted on their mortgages *could meet the heavy legal burden to avoid foreclosure*. Borrowers seeking damages also would face a difficult burden to demonstrate that Fannie Mae is responsible for the *attorneys' misconduct* and the conduct was the proximate cause of damages. Prompt correct action, however, should be taken and would mitigate these risks.[8]

8.  On the issue of transparency, *the mortgage industry has become more complex* and more efficient as it has matured but with a loss of transparency to borrowers.[9]

9.  …the requirement of having *notes endorsed in blank* and the creation of MERS were developments *introduced to reduce paperwork* and the cost of transactions. They have, as

---

[3] Cymrot & Biggs, *supra* Page 9
[4] Cymrot & Biggs, *supra* Page 8
[5] Cymrot & Biggs, *supra* Page 6
[6] Cymrot & Biggs, *supra* Page 6
[7] Cymrot & Biggs, *supra* Page 6
[8] Cymrot & Biggs, *supra* Page 7
[9] Cymrot & Biggs, *supra* Page 7

Mr. Lavalle suggests, reduced *somewhat* the transparency from the borrowers' vantage.[10]

10. Mr. Lavalle proposes that Fannie Mae return to the days when each promissory note is endorsed and each note is returned stamped "paid in full." *He wants an audit trail for mortgage servicing and ownership, and he proposes that borrowers be entitled to circumvent predatory servicers by dealing directly with their note owners.*[11]

11. These *proposals are not practical, not legally required* by the mortgage documents, *and not necessary to meet borrowers' needs.* Borrowers *do not have a legal right* or *an identifiable interest in knowing the current owners of their mortgages* or in the *complex transactions that underlie the secondary mortgage markets.*[12]

12. Mr. Lavalle's proposal that the owner or Fannie Mae, as trustee, should accept loan repayments or otherwise interact directly with borrowers *is contrary to the concept of a secondary market.*[13]

F. As detailed in the book, Chain of Title by David Dayen, it was Plaintiff's investigation, research, and reports and working with former Secretary of State, Jennifer Brunner, now an Ohio Appeals Court Justice, that led to Brunner's criminal referral to the U.S. Justice Department against JPMorgan Chase and Mortgage Electronic Registration Systems, Inc. ("MERS) that days later led to the National Foreclosure Moratorium and soon thereafter, the Justice Department and 50 state attorneys general investigation of the robo-signing and predatory mortgage servicing investigations that led to the National Mortgage Settlement and consent orders with over a dozen mortgage servicers who had to adopt many of the "best practices" that are now required of each mortgage servicer that Plaintiff originally recommended in public reports from 1999 to 2008.

G. One of Plaintiff's reports in 2004 called on the creation of a voluntary National Compliance Center to govern a set of approved best practices for mortgage servicers wherein this report was the genesis for the creation of the Consumer Finance Protection Bureau ("CFPB") and resulting

---

[10] Cymrot & Biggs, *supra* Pages 7-8
[11] Cymrot & Biggs, *supra* Page 8
[12] Cymrot & Biggs, *supra* Page 8
[13] Cymrot & Biggs, *supra* Page 8

consumer protection regulations Plaintiff first proposed as far back as 1999.

H.    Plaintiff's reports have been read and reviewed by top lawyers and regulators across the nation
and plaintiff has offered and provided evidence, advice and counsel to state and federal regulators
including, but not limited to the US Justice Department, FHFA-OIG, FTC, and virtually every
state attorney general in the United States.

I.    Plaintiff's work on predatory mortgage securitization and the securitization fail/fraud scenario he
and his colleagues have documented for over two-decades led to President Obama's RMBS task
force that also led to tens of billions of dollars in settlements with the USDOJ and tens of billions
in settlements with institutional investors.

J.    The actions, processes and systems of Defendant NES were eerily familiar to Plaintiff and a
carbon copy of the predatory mortgage servicing practices he was the first to identify and report
on in the early 90s by mortgage servicers that resulted in tens of billions of settlements with the
U.S. Justice Department.

K.    New York Times Pulitzer Award winning investigative journalist, Gretchen Morgenson wrote of
Plaintiff in a page and half front page feature in the business section of the Sunday, February 4,
2012 issue of the New York Times attached as Exhibit A, *"Knowing what we know now, he
looks more like one of the financial Cassandras of our time — a man whose prescient
warnings went unheeded."* She also **wrote:**

> In hindsight, *what he (Plaintiff) found looks like a blueprint of today's foreclosure
> crisis.* Even then, Mr. Lavalle discovered, some loan-servicing companies that worked for
> Fannie Mae routinely filed false foreclosure documents, not unlike the fraudulent
> paperwork that has since made "robo-signing" a household term. Even then, he found, the
> nation's electronic mortgage registry was playing fast and loose with the law — something
> that courts have belatedly recognized, too. You might wonder why Mr. Lavalle didn't speak
> up.
>       But he did. For two years, he corresponded with Fannie executives and lawyers.
> Fannie later hired a Washington law firm to investigate his claims. **In May 2006, that firm,
> using some of Mr. Lavalle's research, issued a confidential, 147-page report
> corroborating many of his findings.** And there, apparently, is where it ended. There is
> little evidence that Fannie Mae's management or board ever took serious action.
>       Known internally as O.C.J. Case No. 5595, in reference to the company's Office of
> Corporate Justice, **this 2006 report suggests just how deep, and how far back, our**

mortgage and foreclosure problems really go. "It is axiomatic that the practice of submitting false pleadings and affidavits is unlawful," said the report, a copy of which was obtained by The New York Times. "With his complaint, Mr. Lavalle has identified an issue that Fannie Mae needs to address promptly."

What Fannie Mae knew about abusive foreclosure practices, and when it knew it, are crucial questions as Congress and the Obama administration weigh the future of the company and its cousin, Freddie Mac. These giants eventually blew themselves apart and, so far, they have cost taxpayers $150 billion. But before that, their size and reach — not only through their own businesses, but also through the vast amount of work they farm out to law firms and loan servicers — meant that Fannie and Freddie shaped the standards for the entire mortgage industry.

Almost all of the abuses that Mr. Lavalle began identifying in 2003 have since come to widespread attention. The revelations have roiled the mortgage industry and left Fannie, Freddie and big banks with potentially enormous legal liabilities. More worrying is that the kinds of problems that Mr. Lavalle flagged so long ago, and that Fannie apparently ignored, have evicted people from their homes through improper or fraudulent foreclosures. (emphasis added)

L.     In this case, instead of predatory mortgage servicing, we have predatory utility servicing wherein: 1) fraudulent and non-documented meter reads are made; 2) undisclosed and concealed computer formulas and algorithms for dividing and allocating concealed and undisclosed utility water and sewer bills create bills that charge varying rates for alleged individual "metered" water usage; 3) rates are marked up over the actual rates; 4) non-contracted for and deceptive charges are added to the account as "finance fees;" 5) non-contracted and unlawful late charges are assessed and collected that in many cases exceeds the actual fraudulent charges claimed due ; 6) harassing phone calls and emails are made; 7) when questioned about the legitimacy of the billings, questions are ignored, misleading information given, no attempts to remediate the fraud are made; and the harassing collection attempts continue to collect unlawful and non-contracted for debts; 8) unlawful threats of legal action and eviction are made; 9) communication of the debt to third-parties are made; and 10) even when one unlawful behavior is acknowledged years later, it's pay up the rest of what you owe us without addressing the next problematic fraud and abuse.

M.     It's as if Defendant NES' leadership were former leaders of predatory mortgage servicers and found a new scam in a new market taking the predatory servicing playbook with them.

N.    This factual background on Plaintiff's knowledge of abusive, predatory and fraudulent conduct will become apparent to this Court as this Complaint and action is reviewed.

## V.    DEFENDANT NES BACKGROUND & PROMOTION AS DEBT COLLECTOR

A.    Defendant NES is a debt collector that routinely collects consumer debts in the form of utilities for personal consumption by residents and owners of apartments and condominiums.

B.    As reflected in the Better Business Bureau's website attached as Exhibit D, "BBB files indicate that this business (NES) has a pattern of complaints concerning overcharging on customers' water bills. Customers allege that National Exemption Service charges them for water that they have not used. Complaints filed with BBB state that customers start off with a low bill, but then this business bills them for an amount of water that they do not believe that they have used. The BBB has given NES a BBB rating of D+.

C.    It promotes, markets and advertises it's collection services on its website[14]

"**Our professionally staffed <u>in-house Collections Department</u> will *customize a collection program* that meets your needs. *<u>We pursue your delinquencies</u>*, leaving your staff more time to manage your property. How can we be so sure?  With Utility Management, the *hard work begins after the utility bills are mailed and the due date has passed.*  Many of our clients choose NES, because <u>we take <u>on the</u> hard work – COLLECTIONS</u>. Complete with advanced skip tracing tools, voice drops and the best team of collectors in the industry, *NES' collections department works closely with your property management team to reduce delinquencies* and manage returns.**"

PROFESSIONAL SERVICES
- **Collection calls by our professionally trained Collection Representatives.**
- **A tiered series of collection letters, sent by first class mail.**
- **Door hangers, for immediate impact.**
- **Voice drop services.**

REPORTS AND ANALYTICS
- **Current Past Due Reports – 24 hours a day, 7 days a week, on our website.**
- **A designated bank of in-bound collection phone lines.**
- **An assigned Collections Representative, to personally assist with your past dues.**

PAYMENT OPTIONS
- 24-hour payment options.

---

[14] *See* https://www.submeter.com/collections/

- Eight (8) payment options – Visa, MasterCard, American Express, Discover, IVR, US Mail, eCheck, and Auto debit.
- Subscription-based Skip Trace Services.

D.    On its website, NES writes: "our professionally staffed in-house Collections Department will customize a collection program that meets your needs. We pursue your delinquencies, leaving your staff more time to manage your property. How can we be so sure? **With Utility Management, the hard work begins after the utility bills are mailed and the due date has passed. Many of our clients choose NES, because we take on the hard work – COLLECTIONS. Complete with advanced skip tracing tools, voice drops and the best team of collectors in the industry, NES' collections department works closely with your property management team to reduce delinquencies and manage returns."[15] (emphasis added, however ALL CAPS was not emphasis, but Defendant NES' own writing on its website as shown in Exhibit E)**

E.    Factors that affected the rating for National Exemption Service, LLC include: 68 complaints filed against business and that NES has failed to resolve underlying cause(s) of a pattern of complaints.[16]

F.    NES is a Utility Submetering, Billing, and Collections company that is hired by property owners/landlords to bill the residents of their apartment communities for the water and other utilities they use provided by public utility companies.[17]They are not a utility company that provides water service regulated by the state or local authorities.

## VI.    PATTERN & PRACTICE OF NES FRAUDULENT, DECEPTIVE, & PREDATORY SUBMETERING, BILLING & COLLECTION SCHEMES

A.    Plaintiff's experience with NES' fraudulent and predatory billing and collection practices are not unique to Plaintiff as a review of the following complaints posted on Internet Complaint Sites will reflect:

---

[16] *See* https://www.ftc.gov/enforcement/rules/rulemaking-regulatory-reform-proceedings-fair-debt-collection-practices-act-text
[17] *Id.*

I was out of country from Nov 01 2015 till Dec 04 2015. But i received a bill with charges of $49.81 during the period i was away. This is way too much. Even the base charges for JEA is $12 and $14 for water and sewer respectively. Also the Oates Energy Inc even has lower changes when compared to NES. This was a big rip off. **Also my previous bill for 7 days of stay was $22 with NES.** All this time with JEA and Oates energy, inc i **never had any issue with inflated billing. Also the invoice does not provide my meter readings.** Their website does not provide them too. **Their customer care also didn't provide me with the readings.** I regret i didn't know about NES before i moved in else i would have given it a second thought. Also how do i know what is the allowed usage volume in the base charges that NES levy upon its customer. **Its a 1050 Sq ft condo and with zero consumption the charges are $49.81.** I have their service in Summer Key condominium (4908 Key Lime Dr, Jacksonville FL). **They do not respond to emails, phone and no action is taken to handle this inflated billing. I even don't know if their meter reading are correct as they do not let customers their monthly consumption and meter usage.**[18] (emphasis added)

**I moved into my apartment complex last August. Up until yesterday every bill I have ever received has been at least $200!!! This is without late fees. I have complained about the high water bill seeing as how I do not have a washer or dryer, or dishwasher. I am a single female that works two jobs, so my water usage is very minimal. Last month my apartment complex came through the apartments to "change the battery in the water meter to ensure they were working properly" and what would you know my next bill was $17.74. I am livid. I have paid over $1, 200 to this company they have reported negatively against my credit and have caused major tension in my finances.** Is there any action I can take? Because this is highway robbery![19]

The services is give at OLIVINE @ THE TOWNSHIP witch when i star to live here as a owner of the property was describe as a condo conversion complex, now we became a rental community again **an this company is been charging us the water service they said every month but really we recive bills every other month with late charges por unpaid bills, at the first place we tough the mail got lost but still we have to be calling asking for bills to pay on time, the claim was send over the mail, but the late charges are almost the same amount of the bill Ex ample; Previous Utility charges $ 13.85 water (new)charges $ 8.02 Sewer Charges $ 4.79 (Which Departmen audi homuch they assessed for late charges)?- Late Charges $ 12.50**

Total Charges and payment Due $39.16

## VII.    EMPLOYEE/CONTRACTOR COMMENTS ABOUT NES PREDATORY & DECEPTIVE

## PRACTICES

[18] *See* http://www.complaintsboard.com/complaints/national-exemption-service-nes-billing-and-consumption-water-sewer-c788614.html
[19] *See* http://www.complaintsboard.com/complaints/national-exemption-service-nes-billing-c784315.html

A.    An Internet search for review of comments made by alleged NES employees or contractors was conducted by Plaintiff and identified further support for the fraudulent, deceptive and predatory NES collection and billing schemes described of here when a review posted at glassdoor.com read: ***"the shakiest thing is when they have someone with an enormous bill the only resolve they can tell you to tell the customer is "the reads are correct" and will not help you help the customer that customer is stuck with that 500 dollar water bill."***[20] (emphasis adde

---

[20] *See* https://www.glassdoor.com/Reviews/National-Exemption-Service-Reviews-E430011.htm

## VIII.  FACTUAL TIMELINE OF EVENTS BETWEEN THE PARTIES

A.  Decision Process to Seek Ideal Living Arrangement for Pew and Plaintiff

1.  Plaintiff is a 59 year-old male caretaker for his 87 year-old widowed and disabled mother ("Pew").

2.  Pew can only walk with the aid of walker, on occasional days, for no more than 2 to 3 blocks and is on heavy opiate pain management control and needs daily supervision, but has a strong desire to maintain her independence.

3.  Pew owns a home in Boca Raton, Florida without a mortgage, but her physical condition deteriorated to the point that she could no longer control her daily independence and due to the strong opiate medication she was under for pain management, could no longer drive per doctor's orders.

4.  Pew's sister ("Porras"), a 77 year-old female, resides in Winter Haven, Florida and also assists in providing Pew with daily caretaking when Plaintiff travels on business.

5.  Due to the above stated conditions and factors, Pew needed to be close to Plaintiff and Porras so they could provide daily care, but in a way that Pew could maintain her independence.

6.  Plaintiff, an almost 60 year-old single male, desired to maintain his independence as well while being able to care for his disabled mother and not placing her in a adult care or nursing facility.

7.  Many financial, psychological, business and personal issues and factors went into finding the right living and accommodation situation for Plaintiff and Pew based on the information stated herein.

8.    The joint-solution was to live under one roof, but under different ceilings.

9.    For several months, Pew and Plaintiff scoured the Orlando community to find the ideal living situation and arrangement for Pew and Plaintiff.

10.   They targeted several condominiums in the Downtown/Thorton Park area of Orlando for purchase and/or lease and viewed several condos in different buildings with different realtors.

11.   Due to his experience and knowledge, Plaintiff was aware of a few factors and issues concerning leasing a condominium residence that included, but were not limited to:

   a.    Many struggling owners in foreclosure were renting units and not passing the rents onto the rightful mortgage holders that often would result in lessees being unaware of foreclosure proceedings until an eviction notice was served;

   b.    Condominiums, due to Fannie Mae/Freddie Mac and secondary market restrictions, had limits on percentages of rental occupancies;

   c.    Waivers had been issued on such rental occupancy rates in various condominium buildings.

12.   Thus, there were many factors and ultimate financial, business, personal, medical, physical, and psychological factors that went into the decision making process for Pew and Plaintiff as well as the choices they needed to jointly make, as appropriate.

13.   Via a recommendation of a friend, Plaintiff came to learn of a possible situation that would be perfect for Plaintiff and Pew and was ultimately referred to

Defendants Kunert and Kunert Realty.

B.    Plaintiff Identifies the Ideal Living Arrangement for Pew & Plaintiff

    1.    Plaintiff met with Defendants Kunert and Kunert Realty wherein he was informed that:

        a.    Kunert and Kunert Realty represented foreign owners with investments in real estate in the United States;

        b.    Kunert and Kunert Realty were alleged agents for an undisclosed owner who had several properties in the Solaire Condominium building;

        c.    The undisclosed owner had Unit 2403 available for almost immediate occupancy and Unit 2208 available for occupancy in a manner of weeks;

        d.    The undisclosed owner had no mortgages on Units 2403 and 2208 and desired long-term residents who would renew his "investment properties" on an annual basis so there would be no need for changes in tenants;

        e.    The undisclosed owner had the requisite permissions and permits from the Solaire condominium association to allow continual annual renewal leases;

        f.    The undisclosed owner had no desire to sell the units and was an investor in real estate to be leased;

        g.    The undisclosed owner was willing to maintain the units and work with lessees in any way so he wouldn't have to go through tenant changes;

        h.    The undisclosed owner lived out-of-the-country and Defendants Kunert and Kunert Realty had a management contract to manage the proposed

units and that Plaintiff only had to deal with Defendants Kunert and Kunert Realty.

C.    Initial Agreement Reached

1.    An agreement ("First Agreement") was reached between Plaintiff with Kunert and Kunert Realty:

2.    The First Agreement called for an annually renewable lease basis, Units 2403 and 2208 with both Plaintiff and Pew being co-tenants for each unit due to various condo regulations and security measures and Plaintiff acting as Pew's caretaker to allow Plaintiff access to Pew's unit and floor;

3.    The First Agreement called for in the event that Pew could no longer maintain her independence and continue to primarily reside in Unit 2208, Plaintiff would provide 90-days notice to Defendants Kunert and Kunert Realty and be responsible for 90-days of lease payments and would personally assist Defendants Kunert and Kunert Realty in finding a replacement tenant for Unit 2208, but that Plaintiff would fulfill his obligations for Unit 2403.

4.    The First Agreement called for in the event that the undisclosed owner would ever sell either unit while Plaintiff and Pew were residing in Units 2403 and 2208, he would provide them with 90-days notice prior to such decision and an option to purchase based on the best price obtained in any sale proposal to Defendants Kunert and Kunert Realty.

5.    In consideration of the above, Plaintiff agreed to spend considerable time and money in upgrading Unit 2403 with new paint, carpet, plumbing fixtures, lighting fixtures, ceiling fan, and window dressing systems at a cost of several thousand dollars and was not able to fully occupy his unit until completed.

6.  Plaintiff moved into Unit 2403 on or about February 18, 2015 and Pew moved into Unit 2208 in April of 2015.

D.  Start of NES Fraudulent & Abusive Billing & Collection Practices

1.  Shortly after Plaintiff and Pew moved into their units, Plaintiff and Pew received utility collection notices via post card in the U.S. mail for water from Defendant NES.

2.  Plaintiff has no recollection of any agreement between Plaintiff, Pew and NES for water service nor any application made.

3.  The unsupported water utility invoices demanded excessive amounts of money for water utilities, especially since Plaintiff resided in a studio condominium and was away virtually 70% of the time in the first few months since he was caring for Pew in Boca Raton until she moved into her unit.

4.  Plaintiff issued disputes to Defendant NES and asked on numerous occasions for support and backup of the amounts NES was claiming payment on. Plaintiff also asked for how water utilities were metered and payments calculated for each unit.

5.  Defendant NES refused to provide Plaintiff with such backup and supporting documentation in order to audit the claimed utility demands.

6.  Defendant NES made repeated phone calls to Plaintiff's cell phone attempting to collect debts not owed by Plaintiff.

E.  NES Collection Notices Deceptive, Abusive & Fraudulent

1.  In addition to not providing the requested information, the invoices from NES were misleading and hard to decipher. In addition, it appeared on the face of the

billings that Defendant NES was just making up numbers and a simple calculation by Plaintiff indicated that the amounts being charged by NES for usage was variable and not constrained to a his personal usage.

2.      It appeared, from an initial analysis, that Plaintiff's personal water usage was not only being artificially inflated and not properly metered and accounted for, but that some formulaic and undisclosed formula and algorithm was being used for part of the alleged "sub-metered" personal water usage.

3.      For example, alleged meter readings were rounded to zeros in the hundreds and did not correspond to the actual meter readings Plaintiff viewed on the actual meters in the utility closet.

4.      Plaintiff on several occasions throughout two years asked for information from NES and the Solaire Condo Association on how the billings were calculated; the exact metered usage for his units; the dates of usage; how sub-metering was conducted; how his water was paid for; and if any RUBS method of billing was being utilized.

5.      NES and the Condo Association failed to respond for a year and several months to Plaintiff's numerous requests for documentation and support for the utility bills.

6.      Plaintiff refused to pay any water payments until a final resolution to his questions could be ascertained since any payment could have invoked a defense of the voluntary payment doctrine.

F.      Kunert and Kunert Realty Begin Attempting to Collect the Unlawful Debt of NES

1.      On November 3, 2015, Defendants Kunert and Kunert Realty, not NES, made a request for payment of alleged "sub-metered" water and sewer utility bills upon

Plaintiff for Unit 2403 and provided Plaintiff with evidence that created further questions for Plaintiff.

G.   Kunert and Kunert Realty Send NES History to Plaintiff Evidences Fraud

    1.   An incomplete page one of a two page document sent to Plaintiff by Defendants Kunert and Kunert Realty, not Defendant NES, purported to show Plaintiff's alleged obligation to NES as shown directly below:



    2.   In the alleged "accounting history" for Unit 2403, NES reflects Plaintiff as the tenant starting in March of 2014, when Plaintiff did not even view the unit, let alone move into the unit until February 18 of 2015.

H.   Usurious, Unlawful, Deceptive, & Fraudulent NES Fees & Charges Identified

    1.   In addition, the bill contains a monthly "finance fee" of $2.16 for assumed financing of the Plaintiff's water usage wherein Plaintiff has no recollection or knowledge of entering into any financing agreement, let alone any contract or agreement with Defendant NES for any service or agreement whatsoever.

2. This $2.16 finance fee was fraudulently and deceptively assessed, billed, and charged to the Plaintiff's account in Plaintiff's name for Unit 2403 from March 26, 2014, almost an entire year prior to Plaintiff's residency and charged up and through the present date.

3. This same $2.16 finance fee was fraudulently and deceptively assessed, billed, and charged to the Plaintiff's account for Unit 2208 from March of 2015 to the present date.

4. In addition to the deceptive and fraudulent $2.16 "finance fee" placed upon an alleged account that Plaintiff did not agree to, late fees in the amount of $15.00 were being charged to the alleged Plaintiff's account with Defendant NES for payments not obligated by Plaintiff, but by a prior tenant in a fraudulent late fee churning and pyramiding scheme as Plaintiff was aware of from his predatory servicing expertise in the mortgage industry that has resulted in numerous class action lawsuits, regulatory actions, and new regulations in the mortgage industry being created to combat this known widely known "deceptive practice!"

5. In addition to the fraudulently and deceptively assessed, billed, and charged late fee of $15.00 and $2.16 finance fee, Defendant NES also charged Plaintiff fraudulently and deceptively assessed, billed, and charged to the Plaintiff's account for Unit 2403 "collection letter" fees as shown below on the corresponding dates:

6. Plaintiff has no knowledge or recollection of entering into any contract or agreement with NES wherein NES had any right to assess, charge, and/or collect a finance fee or late fee.

7.  To compound the intentional fraud by NES, the fraudulent and deceptive monthly late fee of $15.00, being sought of Plaintiff by Defendant NES via mail and wire, was two to three times the amount of the actual alleged sub-metered water usage of the Plaintiff for Unit 2403.

I.  Unlawful, Deceptive, & Fraudulent Metering & Billing Scheme Identified

1.  For example, the first full month that Plaintiff resided in Unit 2403, March of 2015, his alleged water usage was 15 (assumed 1500 gallons) and the amount charged for that water usage was $5.29 for which he was being billed a usurious $2.16 "finance fee" and a late fee of $155.75, a usurious amount 29 times the amount due for alleged actual water usage by Plaintiff.

2.  Plaintiff was receiving postcards demanding payments of ridiculous amounts and when he called to complain and question the bills, could not obtain any satisfactory explanation.

3.  In addition, to illustrate the further absurdity of the non-contracted NES deceptive, misleading and fraudulent sub-metering and "billing and collection scheme," NES was charging an un-contracted for and approximate 40% finance fee of $2.16 on alleged actual water usage of $5.29.

4.  To illustrate the furtherance of the non-contracted NES deceptive, misleading and fraudulent sub-metering and "billing and collection scheme, a mathematical analysis of statements sent to Plaintiff on August 3 of 2016, after more than a year of requests was recently conducted. The following data, methodology and analysis was conducted.

5.  It is assumed, that if true sub-metering of water utilities was and is occurring that a central water source is being used and billed for and that a percentage of

the actual water usage attributable to each unit is being divided and paid for and that rate should be constant.

6.    It is also assumed that if true sub-metering of water utilities was and is occurring that the rates per gallon of water usage would remain constant from month to month and identical from unit to unit.

7.    For example, on a monthly basis, units 2208 and 2403 should be paying the approximately same per gallon "usage" rate. In understanding the non-contracted NES deceptive, misleading and fraudulent sub-metering and "billing and collection scheme," Plaintiff sought the following information from Orange County on what it charges per gallon for residential use.[21]

| Volume Charges | |
| --- | --- |
| Residential - Water | Per 1,000 Gallons |
| 0–3,000 (gal) | $   1.10 |
| 4,000–10,000 (gal) | $   1.51 |
| 11,000–20,000 (gal) | $   3.02 |
| 21,000–30,000 (gal) | $   6.03 |
| 31,000 and above (gal) | $   12.04 |

8.    An analysis of Plaintiff's water usage from both units reflects that Pew and Plaintiff used no more than 1900 gallons in any given month and a low of 500 gallons.

9.    Using the Orlando Water figures above of $1.10 a gallon, Pew and Plaintiff should not have paid more than $2.20 for water usage in any given month.

10.   Water utility rates are highly regulated. Unlike gasoline, monthly water rates should not fluctuate and should remain fairly constant except for rate hikes.

---

[21] *See* http://www.orangecountyfl.net/Portals/0/Library/Water-Garbage-Recycle/docs/WasteWaterReclaimedWaterRates.pdf

11.    As a further evidence of the non-contracted NES deceptive, misleading and fraudulent sub-metering and "billing and collection scheme, the per gallon water rates for each unit should also remain constant. For illustrative purposes, using the Orange County water rate of $1.10 per gallon, both units 2403 and 2208 should be paying the same rate per gallon if true sub-metering were occurring.

12.    Additionally, the rate should also remain constant from month-to-month with few adjustments. However, an analysis for unit 2208 as shown below, proves beyond any doubt that this is not true.

| From | To | Previous Read | Current Read | Usage | Water Charge | Water % |
|------|------|------|------|------|------|------|
| 6/24/15 | 7/24/15 | 15100 | 15700 | 600 | $4.25 | 0.708333% |
| 7/24/15 | 8/24/15 | 15700 | 16200 | 500 | $4.08 | 0.816000% |
| 8/24/15 | 9/24/15 | 16200 | 17600 | 1400 | $5.61 | 0.400714% |
| 9/24/15 | 10/24/15 | 17600 | 18500 | 900 | $4.76 | 0.528889% |
| 10/24/15 | 11/24/15 | 18500 | 19200 | 700 | $4.42 | 0.631429% |
| 11/24/15 | 12/24/15 | 19200 | 19800 | 600 | $4.25 | 0.708333% |
| 12/24/15 | 1/24/16 | 19800 | 21000 | 1200 | $5.27 | 0.439167% |
| 1/24/16 | 2/24/16 | 21000 | 22000 | 1000 | $5.01 | 0.501000% |
| 2/24/16 | 3/24/16 | 22000 | 23300 | 1300 | $5.52 | 0.424615% |
| 3/24/16 | 4/24/16 | 23300 | 24000 | 700 | $4.50 | 0.642857% |

own above for service from 6/24/15 to 7/24/15, water usage was alleged to be 600 gallons even with a water charge of $4.25. A division of $4.25 by 600 gallons provides a rate of $0.0070833 per gallon or a rate of $7.08 per thousand gallons.

14.    As shown above for service from 7/24/15 to 8/24/15, water usage was alleged to be 500 gallons even with a water charge of $4.08. A division of $4.08 by 500 gallons provides a rate of $0.00816 per gallon or a rate of $8.16 per thousand gallons.

15.    As shown above for service from 2/24/16 to 3/24/15, water usage was alleged to

be 1300 gallons even with a water charge of $5.52. A division of $5.52 by 1300 gallons provides a rate of $0.0042461 per gallon or a rate of $4.25 per thousand gallons

16.    The data above reflects that the per gallon rate is not fixed and constant, save for annual or other rate adjustments and that the rate charged fluctuates at almost 100% from a low of $4.25 per gallon to a high of $8.16 per gallon when if true and actual sub-metering were occurring, the per gallon rate should remain constant without fluctuation from month-to-month.

17.    This is evidenced and supported by the monthly sewer charges as reflected below for Unit 2208.

| From | To | Previous Read | Current Read | Usage | Sewer Charge | Sewer % |
|------|-----|------|------|------|------|------|
| 7/24/15 | 8/24/15 | 15700 | 16200 | 500 | $4.40 | 0.880000% |
| 8/24/15 | 9/24/15 | 16200 | 17600 | 1400 | $12.32 | 0.880000% |
| 9/24/15 | 10/24/15 | 17600 | 18500 | 900 | $7.92 | 0.880000% |
| 10/24/15 | 11/24/15 | 18500 | 19200 | 700 | $6.16 | 0.880000% |
| 11/24/15 | 12/24/15 | 19200 | 19800 | 600 | $5.28 | 0.880000% |
| 12/24/15 | 1/24/16 | 19800 | 21000 | 1200 | $10.56 | 0.880000% |
| 1/24/16 | 2/24/16 | 21000 | 22000 | 1000 | $8.80 | 0.880000% |
| 2/24/16 | 3/24/16 | 22000 | 23300 | 1300 | $11.44 | 0.880000% |
| 3/24/16 | 4/24/16 | 23300 | 24000 | 700 | $6.16 | 0.880000% |
| 5/24/16 | 6/24/16 | 25300 | 26100 | 800 | $7.04 | 0.880000% |
| 6/24/16 | 7/24/16 | 26100 | 26900 | 800 | $7.04 | 0.880000% |

sewer charge remains set for each month at an identical rate of $0.00880 per gallon or $8.80 per thousand gallons.

19.    As shown in the picture below of the alleged water sub-meter installed in Unit 2403, the meter actually measures to tenths, but all meter readings read in even zeros to the hundreds.

31



20.     However, what is even more telling of the non-contracted NES deceptive,

misleading and fraudulent sub-metering and "billing and collection scheme," is

the "rounded" comparative analysis of same month billing cycles for water

usage between Units 2403 and 2208 as illustrated by the sample below:

| Unit | From | To | Usage | Water $ | Water % | Gallon | 1000 Gallons |
|------|------|------|-------|---------|---------|--------|--------------|
| 2208 | 7/24/15 | 8/24/15 | 500 | $4.08 | 0.816000% | 0.0082 | $8.16 |
| 2403 | 7/24/15 | 8/24/15 | 900 | $4.76 | 0.52889% | 0.0053 | $5.29 |
| 2208 | 8/24/15 | 9/24/15 | 1400 | $5.61 | 0.400714% | 0.0040 | $4.01 |
| 2403 | 8/24/15 | 9/24/15 | 1900 | $6.46 | 0.34000% | 0.0034 | $3.40 |
| 2208 | 9/24/15 | 10/24/15 | 900 | $4.76 | 0.528889% | 0.0053 | $5.29 |
| 2403 | 9/24/15 | 10/24/15 | 1900 | $6.46 | 0.34000% | 0.0034 | $3.40 |
| 2208 | 10/24/15 | 11/24/15 | 700 | $4.42 | 0.631429% | 0.0063 | $6.31 |
| 2403 | 10/24/15 | 11/24/15 | 900 | $4.76 | 0.52889% | 0.0053 | $5.29 |
| 2208 | 11/24/15 | 12/24/15 | 600 | $4.25 | 0.708333% | 0.0071 | $7.08 |
| 2403 | 11/24/15 | 12/24/15 | 1100 | $5.10 | 0.46364% | 0.0046 | $4.64 |
| 2208 | 12/24/15 | 1/24/16 | 1200 | $5.27 | 0.439167% | 0.0044 | $4.39 |
| 2403 | 12/24/15 | 1/24/16 | 1400 | $5.61 | 0.40071% | 0.0040 | $4.01 |
| 2208 | 1/24/16 | 2/24/16 | 1000 | $5.01 | 0.501000% | 0.0050 | $5.01 |
| 2403 | 1/24/16 | 2/24/16 | 1800 | $6.37 | 0.35389% | 0.0035 | $3.54 |
| 2208 | 2/24/16 | 3/24/16 | 1300 | $5.52 | 0.424615% | 0.0042 | $4.25 |
| 2403 | 2/24/16 | 3/24/16 | 1900 | $6.54 | 0.34421% | 0.0034 | $3.44 |
| 2208 | 3/24/16 | 4/24/16 | 700 | $4.50 | 0.642857% | 0.0064 | $6.43 |

21.    As illustrated above, there is no rhyme nor reason for the variances of per gallon/per 1000 gallon rates being charged for each unit, month-to-month.

22.    For example, the per 1000 gallon rate being charged for Unit 2208 for July to August of 2015 water usage is $8.16 for Unit 2208 and $5.29 for Unit 2403, an unexplained variance of 65%

23.    The per 1000 gallon rate being charged for Unit 2208 for July to August of 2015 water usage is $8.16 for Unit 2208 and $5.29 for Unit 2403.

24.    Monthly variances were as high as 87% for the same monthly billing rate.

25.    As further evidence of the NES deceptive, misleading and fraudulent sub-metering and "billing and collection scheme", at the inception of the account for Unit 2403, in addition to the deceptive, fraudulent and usurious $2.16 "finance fee" and $15.00 "late fee," Defendant NES assessed, billed, attempted to collect and did eventually collect and coerce by means of the U.S. Mail and wires the following non-contracted and non-obligated fees for sending collection notices to the Plaintiff via letters without addressing Plaintiff's concerns:

| From | To | Misc. Fee | Detail |
|------|------|-----------|--------|
| 5/24/15 | 6/24/15 | $5.75 | PR MAIL |
| 6/24/15 | 7/24/15 | $6.73 | Late Fee - Certf. Mail |
| 1/24/16 | 2/24/16 | $5.75 | Late Fee - PR MAIL |
| 3/24/16 | 4/24/16 | $6.73 | Late Fee Cert |

26.    Based on the current evidence in this matter and Plaintiff's preliminary research, investigation, experience, knowledge and expertise, Defendant NES is intentionally misleading, deceiving and defrauding Plaintiff, Pew and other lessors and renters in the Solaire Condominium as well as other communities for utility services by:

a.    Assessing, billing and collecting unlawful, illegal and non-contracted for fees and expenses for it's exclusive benefit;

b.    Marking up utility bills and assisting Homeowners Associations

("HOA") and owners of residential real estate buildings to earn more income and revenue to cover shortfalls for such groups;

c. Using undisclosed and concealed formulas and algorithms in the NES deceptive, misleading and fraudulent sub-metering and "billing and collection scheme" to allocate "common area" utility and sewer expenses that are the legal responsibility of HOAs and owners of residential real estate buildings, not lessors and renters in such billing by adding all and/or a portion of the utility costs that should be paid by HOAs and real estate owners via assessments or increased rent.

d. Using a non-disclosed and concealed Ratio Utility Billing System ("RUBS") for all or a portion of the water and sewer bills being sent and intentionally misleading, deceiving, and defrauding owners, lessors and others into believing their water utilities are being metered and paid for only their individual units based on their own individual actual water use.

J. Plaintiff's Detailed Disputes & Questions About Bills, Fees & Metering

1. As the dispute escalated and Defendant NES attempted additional unlawful collection of fraudulently assessed fees and charges, Plaintiff sent an email on November 10, 2015 to Defendant NES and copied Defendants Kunert and Kunert Realty that read: "*You all don't seem to get the request I am making. I received a bill from the owner's agent claiming over $500 owed for 2403 when as your bill indicates, my bill is like $10 to $15 a month for 2208 that uses more water and I have only been in unit since February and have occupied the unit less than half the time. I need each month's breakout for billing for units 2304*

*and 2208 as well as amounts charged and owed. In addition, please provide me with the manner in which you bill if on a rub system or actually metered usage and how your calculations are made and the utility bills paid that form the basis for your calculations.* " (emphasis added)

2.   On December 18, 2015, Plaintiff sent Defendant NES and copied Defendant Kunert and Kunert Realty with yet another email after NES only sent Plaintiff one statement via pdf that read: "*For the LAST time. You keep sending me One bill or statement or a total amount due. I need EACH MONTHLY statement for the following units and time periods: Soliare Unit 2404 from February 15, 2015 to present date. Soliare Unit 2208 from March 1, 2015 to present date. As soon as you provide the requested information, I will have a check cut for you all. I bill out far more than this is costing me in time. I am traveling, have a very ill mother I am looking after, and had recent surgery myself. You cannot expect me to just cut a check for what you claim is owed. This money comes from a trust account to which I am trustee for and I have a fiduciary duty to beneficiaries and need the backup. I have asked now for months. Perhaps, if you did not send a $500 bill to me in my name for the first month I was in my unit, we would not have this problem. I am just getting back to use of my arm and typing, so I don't want to ask again.*" (emphasis added)

K.   **Defendant Fernando's Request & Agreement on New Modified Arrangement**

1.   In December of 2015, Defendant Fernando called Plaintiff on his cell phone in Florida representing that he was the owner of Units 2208 and 2403.

2.   This was the first occasion that Fernando was ever disclosed or identified to Plaintiff as the owner of Units 2208 and 2403.

3.    As of January 5, 2017, Defendant Fernando in a text to Plaintiff held himself out as being the owner of Units 2208 and 2403 when he contacted the Plaintiff with questions about his occupancy.

4.    However, based on recent discoveries; preliminary research and investigation; information and belief; and likely to have more evidentiary value after discovery, it is Defendant ABS that is the owner of Units 2403 and 2208, a fact never disclosed to Plaintiff by Defendants Fernando, Kunert Realty, and Kunert.

5.    However, Plaintiff and Defendant Fernando renegotiated and extended the agreement for lease and options months earlier with Plaintiff and Pew for Units 2403 and 2208.

6.    In their phone call, Defendant Fernando discussed his desire to keep Plaintiff and his disabled mother in the unit and Plaintiff informed Defendant Fernando of his mother and his desire to remain in the units until she could no longer be able to remain independent, but until that time or her death, they would continue to annually renew and Defendant Fernando unequivocally stated that was his desire and intent and agreed to the same.

7.    At the same time, Plaintiff and Defendant Fernando discussed various purchase options since that was the prior agreement with Defendant Kunert and Kunert Realty if the owner ever intended to sell.

8.    Plaintiff inquired as to why Defendant Fernando needed to renew their annual agreement months earlier than previously agreed upon and Defendant Fernando replied the HOA was insisting on such agreement.

9.    Plaintiff, being extremely knowledgeable about Fannie Mae and Freddie Mac servicing and sales guidelines and even contributing to such guidelines was

cognizant that the FHFA, Fannie, Freddie and its servicers were cracking down on exemptions and requiring HOAs to adhere to the percentages allowed for lessors and renters across America.

10.     Plaintiff was also aware that other owners in the building were being denied "permits" for rentals and were being forced to sell their units.

11.     Defendant Fernando stated to Plaintiff that all of his units in the building were rentals and that he had a good relationship with the HOA and that he never had any intention to sell the unit and that his business was based on renting real estate.

12.     Plaintiff was concerned, due to his knowledge and neighbors comments, that HOAs can change their rules and permit process and since he was a caretaker for his mother, he didn't want to get caught in the middle of any HOA decision to change its rules or Defendant Fernando's ability to continue the agreement on an annual renewable basis.

13.     Fernando expressed that he purchased the units for a very good price and it would not behoove him to ever sell the units and that Plaintiff and his mother, health permitting, could continue to reside in the units as long as they desired.

14.     However, in addressing Plaintiff's concerns about the HOA situation, Plaintiff and Defendant Fernando came to the following agreements in extending their annually renewable arrangement per Plaintiff's suggestion that would meet each of their needs.

15.     If Fernando was forced to sell the unit due to the HOA not continuing the residency of Pew and Plaintiff, Defendant Fernando would sell to Pew, Plaintiff, an LLC or some other vehicle, each unit and finance the purchase with an

interest only balloon mortgage or similar terms that would continue the same amount of monthly payments so that it would incorporate taxes and insurance and remain the same "cash flow" to Defendant Fernando.

16. Plaintiff and Defendant Fernando even discussed setting up a mutual LLC or some vehicle that would work around the HOA's regulations, the needs of Plaintiff and his mother Pew and Defendant Fernando's need for the continual cash flow.

17. In simple terms, Defendant Fernando and Plaintiff agreed to work around and find a solution for Defendant Fernando to continue having an interest in real estate and receiving the same cash flow on an annual basis and keeping Pew in her unit until she was no longer independent or upon her death and Plaintiff in his unit indefinitely or until agreed upon separation.

18. Plaintiff even discussed additional upgrades to the unit with storage and bathroom modifications.

19. Since Pew's health was an issue, Plaintiff and Fernando agreed that Plaintiff would be responsible for providing Defendant Fernando 3-months notice and would cover those 3-months of payments if Pew was forced into a nursing facility or passed.

20. As for Plaintiff's unit, he would remain in the unit from year-to-year and did not see himself leaving the residence.

21. Defendant Fernando and Plaintiff agreed to those terms.

L.    NES' Unlawful Collection Efforts & Plaintiff's Responses & Lawsuit Threats

1. On December 28, 2015, Plaintiff sent Defendant NES a reply email in response

to another unlawful collection request that stated: "*one more notice from you without the requisite information I have asked for will result in a lawsuit under fair debt collection and deceptive practices act. Please govern yourselves accordingly!*" (emphasis added)

2.    On January 27, 2016, Plaintiff sent Defendant NES a reply email in response to another unlawful collection request that stated: "*how many times do I have to tell you all to send me what I have asked for? I am tired of this crap and will sue you all for deceptive trade practices and fair debt collection violations if you do not provide the requested information I have asked for on over a dozen occasions now. Geez, how difficult is it to get me the information for each month requested?*" (emphasis added)

3.    On April 25, 2016, Plaintiff sent Defendant NES a reply email in response to another unlawful collection request that stated: "*I am going to remit a lawsuit is what I am going to remit!  Done!*"

4.    On August 3, 2016, Plaintiff sent Defendant NES a reply email in response to another unlawful collection request that stated: "*stop sending me this BS until you comply with my prior requests!*"

5.    In response to my August 3, 2016, email, Defendant NES replied: "**I do not understand your request. I do not have any previous notes.  I will forward to my manager to review, but in the meantime your bill is over $400.00. This is a monthly utility bill to be paid by all residents, *property management, condo association and Owner* will be contacted. Thank you, Michelle Stearns, *Collections Department* ,N.E.S., LLC.**" (emphasis added)

6.    In response to Ms. Stearns email, Plaintiff responded: "*Well your company*

*better look since it will be facing a lawsuit! I'm sick and tired of this mess. My time is more valuable than the measly sums you request. I've asked your company on dozens of occasions for my bills and details of EVERY BILL. I will NOT take another second or minute of my time to do your job for you. Have your company look at ALL the emails sent from this email address in its system. Also, Google my name. I do not think you want to get on my bad side. From the first bill, you charged me for bills, hundreds of dollars, owed by prior tenants before we moved in. I will not agree to pay those and I required a detailed billing and have requested that NUMEROUS times in the past year. Send me a bill and usage for both units 2403 and 2208 since the date of our occupancy for each month of occupancy from 3/1/15 to date. All I want. Please govern yourselves accordingly!"* (emphasis added)

7.  In response to the email, Plaintiff received the following email: "*Would you like the information in printed format via postal service or will electronic mail suffice? Also, once received, please advise me if there is anything else you may need to assist you in harvesting the information you require to make a decision on how to handle the balance in question. Michelle, Thank you for your hard work, I will take it from here. Thank You, Mike Ramirez **Collections Manager** National Exemption Service 727-725-7303.* " (emphasis added)

M.  NES After More Than A Year of Requests, Provides Backup Statements for Billings

1.  Finally, after more than a year and a half of requests to NES and the HOA, Plaintiff received a good portion of the monthly statements from Defendant NES and reviewed a small sample on August 3, 2016.

2.  In his review, Plaintiff identified the deceptive, misleading and fraudulent

practices he suspected. In fact, Plaintiff discussed the matter with various national class action, Qui Tam and plaintiff's counsel he works with on a daily basis.

3. Plaintiff was weighing his legal options and responses to Defendant NES' fraudulent and deceptive practices as well as their unlawful collection schemes.

4. Plaintiff was extremely busy and could not address his legal response until things died down at the end of the year.

N. Defendants Kunert, Kunert Realty & Fernando Begin Interference & Harassment

1. On September 13, 2016, Defendants Kunert and Kunert Realty sent the Plaintiff an email and attached the fraudulent bill of Defendant NES that read: "*Hello Nye, See attached delinquent notice. When are you going to take care of this?" Regards, Andy*"

2. In response to Defendants' Kunert and Kunert Realty's September 13, 2016 email, Plaintiff responded in part: "*I have been swamped with summer travel a few cases with Morgan & Morgan in addition to mom. FINALLY got invoices I have been asking for over a year a few weeks ago. A preliminary review shows they had billed us hundreds of dollars (as I suspected) for prior tenants right from the start. I don't have ANY time (was up to midnight working on trial brief last night) and been up since 6 AM working on a new affidavit. Things been crazy since this new book and story broke (see https://newrepublic.com/article/134722/foreclosure-sleuth) and trying to get a new girl asst to help out since my prior is now gone to grad school. In any event, am on it. Don't pay. I've been asking for invoices for over a year as you know. When I have time I will get to it. But, my time is far more valuable than*

42

.

*spending hours to do their job. Not, however, going to pay them for their F-ups and inability to keep bills straight and respond in a timely fashion. Way too much happening now.*" (emphasis added)

O.    **Kunert & Fernando Threaten Unlawful Eviction to Collect Unlawful Debt**

1.    On September 22, Defendants Kunert and Kunert Realty sent the following email to Plaintiff: "*Hello Nye, Just a heads up - 3 day notice for eviction is being served again today for non payment of September 2016 rent as well as the 7 day notice to cure the outstanding water/sewer bills (see attachments as well ). I will personally drop them off today ( as per Instructions of owner ).*"

2.    Plaintiff had paid the monthly rent demanded as previously agreed upon.

3.    On October 20, Plaintiff received an email from Defendants Kunert and Kunert Realty that read "*It's getting serious. Please remit payment. Attorney of owner will send out eviction notice tomorrow due to non payment of utilities. Just a heads up.*"

4.    On October 24, Plaintiff was adamant in his response to Defendants Kunert and Kunert Realty when he sent an email that read: "*I am involved in a few major BOA cases where I am on page 154 of a report and affidavit in cases involving tens of billions of dollars and traveling like crazy taking time away from mom. Been working 28 to 20 hour days. I perused the documents they provided me before and they reek of a fraudulent billing scheme. Alleged meter readings are extremely precise and seem programed to me. Also, they refused to answer questions I previously sent to them. Lastly, their first bills to me were for hundreds of dollars for the first month I was here. I don't have time to get into this and will not have time until the Thanksgiving holidays. I*

*am not going to pay a bill that on its face appears like part of a fraudulent scheme. I suspect there are no meter readings at all and the water bills are being made up! Please don't bother me wit this nonsense Andy since I don't have the time to deal with this now and I asked them for over a year for information and answers. Trust me, they don't want to be on the end of a class action. When I have time, which I don't right now, I will go over what one of my assistants prepared and review*." (emphasis added)

P.    Plaintiff Provides NES Detailed Questions About "Questionable" Billing Practices

1.    On October 26, 2016 Plaintiff replied to Defendant NES with the following email "*I received the bills finally after many months of requests. Many months. I am extremely busy to go over the auditing of them completely, but let me tell you what our preliminary audit and review reveals and why I asked for additional answers. The beginning balances appear to have included amounts due and owing from prior occupants. Review beginning service dates and balances for units 2208 and 2403. Then, each "meter reading" appears too even measured meaning they look like they are being made up and not reflective of true "meter use" and "meter readings" and indicative of a possible RUBS system of billing I am unaware of. I asked for statements for over a year to review and didn't receive until weeks ago. I am currently busy in a multi-billon fraud case where I am on page 167 of a report that needs to be completed this week before I leave on a 2-week business trip a week from today. I have only been able to review the preliminary data, but I would ask you the following for both units: #1 What start date do you have for service for each unit (2208 and 2403); #2 What was the balance before the start date for each unit; #3 What*

*was the first billing date and balance; #4  How are meters read, how often are*

*they read, and what is the nearest decimal for readings on the meters; #5  If a*

*RUBS system is being utilized, what are those measuring and dividing*

*measures?" I will address your responses and resolve these issues when I am*

*back in the middle of next month. At present, I have no time to even breath, let*

*alone continue addressing this mess."* (emphasis added)

2.    In response to Plaintiff's prior email, Defendant NES responded: *"Thank You,*

*Mike Ramirez **Collections** National Exemption Service."*

Q.    NES Offers Help Then Doesn't Respond to Plaintiff's Detailed Questions

1.    Incredulously, the same Mike Ramirez who acknowledged Plaintiff's email

with a thank you, sent an email to Plaintiff on November 1, 2016 that read:

*"Good Afternoon, Do you need additional information at this point? Thank You,*

***Mike Ramirez Collections National Exemption Service.***" (emphasis added)

2.    The email of November 1, 2016 was the last communication received by

Plaintiff and Defendant NES never responded to Plaintiff's numerous requests

via phone and email. Plaintiff had no option than to take legal action.

R.    Defendants Kunert, Kunert Realty & Fernando Admit NES Fraud, But Demand

Payment to NES

1.    On November 11, 2016, Defendants Kunert and Kunert Realty sent Plaintiff an

email that stated: *"**Hello Nye, Please find attached the newly updated -**

**outstanding water / sewer bill for your Unit # 2208. The owner himself**

**contacted NES and had them update the account to match the starting date of**

**your lease. You are not paying for anybody else but your own usage.** Current*

*tenant Mr. Nye Lavalle again ...**He is only responsible as of February 18-***

*2015 He has not paid since july-2015 therefore his outstanding amount as of September, 24th 2016 is $510.11 Please ask him to pay this asap Please remit payment to Kunert Management, LLC asap.*" (emphasis added)

2.     Thus, all Defendants as of November 11, 2016 were fully aware that Plaintiff was billed hundreds of dollars in non-obligated bills that were the responsibility of the prior tenant, if any, but still refused to address each of the fraudulent billing schemes identified by Plaintiff and now Defendant Kunert Realty was demanding payment of the non-contracted for and unlawful debt to themselves. Plaintiff naturally refused.

3.     It also must be noted that Defendants Kunert, Kunert Realty and/or Fernando held $2500 in security deposits of the Plaintiff.

4.     Soon thereafter, with delivery and payment of the November obligation, Plaintiff sent a note to Kunert and Kunert Realty that he desired a written agreement to confirm his prior arrangements and agreement reached with Defendant Fernando and that he desired to do improvements to both unit's bathrooms and Plaintiff's closet/storage.

5.     Plaintiff desired to install a new walk-in bath and shower with handicap grab bars in Pew's 2208 Unit and a Jacuzzi bath in Plaintiff's 2403 Unit along with new closet storage.

6.     Also, on November 11, 2016, Kunert sent Plaintiff an email that read: "**Hello Nye, Please see email below from owner. Call me directly to discuss if any questions. Regards, Andy ANDREAS KUNERT  KUNERT REALTY,INC., 1540 International PKWY, Suite 2000; andreas@kunertrealty.com kunertrealty.com; Begin forwarded message:**

From: Bimal Fernando fernando@expotransintl.com Subject: Solaire unit 2403; Date: November 10, 2016 at 5:38:12 PM EST; To: Andreas Kunert andreas@kunertrealty.com; Good Evening Andy, Please find attached. This will explain everything. *After talking to NES and analyzing the account please see below findings.* Current tenant is only responsible as of February 18-2015 therefore his outstanding amount as of September, 24th 2016 is $701.28 Please ask him to pay this asap. I have asked my office to issue a check for the previous outstanding balance(from March-26-2014 to Feb-24-2015) $328.06. I hope this will resolve the matter and we all can move forward. Please send this message to the tenant. Best Regards, BIMAL FERNANDO."

7.    No backup to the answers Plaintiff sought from Defendant NES was forthcoming.

8.    Each Defendant was fully aware that Plaintiff was looking at litigation and exploring a class action against Defendant NES.

9.    Here, is an admission that Defendant NES had attempted to collect for almost two-years, disputed and unlawful fees, usage and bills not owed or obligated by the Plaintiff.

10.    Yet, there were still no answers to the underlying fraud and deceptive sub-metering issues and rates. Just pay was what everyone believed was claimed to be owed, including late fees and finance charges.

11.    This was the same arrogant process that Plaintiff had discovered decades earlier in the mortgage servicing industry.

S.    Kunert, Kunert Realty, Fernando and ABS Interference In Plaintiff's Legal Claims

1. Yet, instead of adhering to Plaintiff's requests not to pay Defendant NES and not to interfere and not to bother him that he would be dealing with the matter in likely litigation, Defendants ABS and Fernando paid the unlawfully billed amounts of the prior tenant that they always knew was not Plaintiff's responsibility.

2. Again, Plaintiff refused to pay any bills from Defendant NES until his questions were answered. The prior tenant's overcharges were just one of many unlawful acts outlined to each Defendant.

3. The actions, processes and systems of Defendant NES were eerily familiar to Plaintiff and a carbon copy of the predatory mortgage servicing practices he was the first to identify and report on in the early 90s by mortgage servicers that resulted in tens of billions of settlements with the U.S. Justice Department.

4. However, in this case, instead of predatory mortgage servicing, we have predatory utility servicing wherein: 1) fraudulent and non-documented meter reads are made; 2) undisclosed and concealed computer formulas and algorithms for dividing and allocating concealed and undisclosed utility water and sewer bills create bills that charge varying rates for alleged individual "metered" water usage; 3) rates are marked up over the actual rates: 4) hidden unknown charges are added to the account as "finance fees;" 5) non-contracted and unlawful late charges are assessed and collected that in many cases exceeds the actual fraudulent charges claimed due ; 6) harassing phone calls and emails are made; 7) when questioned about the legitimacy of the billings, questions are ignored, misleading information given, no attempts to remediate the fraud are made; and the harassing collection attempts continue to collect unlawful and

non-contracted for debts; 8) unlawful threats of legal action and eviction are made; 9) communication of the debt to third-parties are made; and 10) even when one unlawful behavior is acknowledged years later, it's pay up the rest of what you owe us without addressing the next problematic fraud and abuse.

5.      It's as if Defendant NES' leadership were former leaders of predatory mortgage servicers and found a new scam in a new market taking the predatory servicing playbook with them.

T.      Plaintiff Informs Kunert that He Will Review & Address Issues

1.      In response, on November 11, 2016 Plaintiff replied with an email to Defendants Kunert and Kunert Realty that read: *"Thanks I will review when I return back on Wednesday as I mentioned before I'm out of town until the 15th **I want to make sure but also no one has addressed the metering issue.**"* (emphasis added)

U.      Defendants Demand Payment of Unlawful Debt, But Refuse to Address Disputes

1.      On November 16, 2016, Defendants Kunert and Kunert Realty sent Plaintiff another email demanding payment of the unlawful NES bills and stated: *"Hello Nye, Hope you got back to Orlando well. Please give me a call tonight or tomorrow to discuss the outstanding utilities. We need to this settled this week."*

2.       The only focus of any of the Defendants was have Plaintiff pay what NES fraudulently, deceptively and unlawfully claimed was owed without addressing Plaintiff's extremely legitimate issues and questions, including his legal and due process rights. Plaintiff ignored the request as per his prior instructions and requests to Defendants.

V.      Defendants Increased Harassment of Plaintiff & Pew

1.  On November 17, 2016, Defendants Kunert and Kunert Realty sent Plaintiff yet another email that stated: "*Hello Nye. This is my second request to contact me regarding the outstanding utilities on your 2 units. Please contact me asap to resolve.*"

2.  Plaintiff's disputes over the utility billings were with Defendant NES, not Defendants Kunert, Kunert Realty or Fernando who had inserted themselves into the dispute.

3.  Defendants Kunert, Kunert Realty and Fernando had now tortuously inserted themselves into Plaintiff's legal disputes and rights and there was nothing they could do to answer and resolve Plaintiff's myriad of questions and his legal claims that they could not address.

4.  On November 18, 2016, Defendants Kunert and Kunert Realty sent Plaintiff yet another email that stated: "*Hello Nye, This is my third request to contact me regarding the outstanding utilities on your 2 units...*"

5.  On November 23, 2016, Plaintiff notified Defendants Kunert and Kunert Realty in a email of the following: "*Sent a driver to your office, but receptionist had already departed. The driver left a check in Schwab envelope on the receptionist's desk. I have finally completed my 245-page affidavit, so will look at utility figures tomorrow when I have a few moments and send an email to NES with questions for their answers. I think they are using some form of unidentified RUBS allocation system and not actually metering.*"

W.  **Defendant Fernando Breaches Agreement & Harasses Plaintiff & Pew**

1.  On November 30, 2016, Defendants Kunert and Kunert Realty in defiance of the prior agreements reached with Defendant Fernando, sent the following email

to Plaintiff: "Hello Nye, Please find attached the non renewal notices for your leases which are expiring on 12/31/2016. A hard copy is being dropped off to you by the HOA today as well. Call me anytime if you have any questions. Hopefully we can make this a smooth transition"

2.      Defendants Kunert and Kunert Realty tacitly acknowledged in the email their concern over violating the Plaintiff's agreements with Defendant Fernando when he commented "Hopefully we can make this a smooth transition."

3.      Here, knowing of the prior agreements reached with Defendant Fernando, knowing that Pew was an 87 year-old disabled and infirmed elderly female and Plaintiff was her caretaker; knowing that prior agreements called for a mutual 90-day notice of any changes if the HOA decided to change its permitting policy or Pew needed to move due to health issues or her death; and knowing Plaintiff was dealing with many serious matters and it was the holidays, Defendants Kunert, Kunert Realty and Fernando breached their agreements with Plaintiff and began further institution of harassing behavior.

4.      In response, Plaintiff made his intentions known to Defendants Kunert, Kunert Realty and Fernando when he wrote in response: **"I am not going to address our issues and grievances in an impromptu email, but I shall respond to you and the unit owner in the coming day. Until then, please have your company and the unit owner preserve all data, images, electronic records, voicemails, communications, bills, invoices, text messages, and data, records, or information in paper, electronic and other forms and mediums for units 2208 and 2403, not 2208 and 2208 since these matters appear to be headed to litigation in Federal or state court in the coming days. Thank you**

**kindly and please govern yourselves accordingly!**" (emphasis added)

5.  At this point, Defendants were on clear notice that Plaintiff's subsequent response would be via a Federal or State court lawsuit.

6.  On December 11, 2016, Defendants Kunert and Kunert Realty sent Plaintiff another email wherein it stated: "*Hello Nye, What is the status of December 2016 rent payment for your units # 2208 & # 2403 ? We have not received them. Also, what about the outstanding water/sewer bills? They still have not been paid. Let me know.*"

7.  Plaintiff responded: "was delivered to you on Friday."

8.  On December 19, 2016, Defendants Kunert and Kunert Realty at the direction of Defendant Fernando, sent Plaintiff another harassing email demanding payment of the unlawful, non-contracted, non-obligated and fraudulent alleged debt when they wrote: "*Hello Nye, Thank for delivering the Dec rent payment. We did not get the outstanding utility amounts from NES ( Owner paid them already to avoid collection ). When will you be making this payment to owner ? Also, how is the move coming ? When would you like to schedule the through ? Regards, ANDREAS KUNERT, KUNERT REALTY, INC.*"

9.  Even after threats of litigation; breach of their contracts; requests to stop harassment and holding a $2500.00 security deposit, Defendants Kunert, Kunert Realty and Fernando are demanding payment of a fraudulently created bill; an obligation for which there was a legitimate dispute with a third-party; and payment to a party that now is not even believed to be the actual owner of Units 2403 and 2208.

X.  **Defendant ABS Pays Plaintiff's Unlawful & Disputed Debt with NES**

1.  Despite the threat of lawsuits; warnings to not get involved; not to pay Defendant NES; and to not interfere with Plaintiff's due process rights and legal claims, Defendants Kunert, Kunert Realty and Fernando still continued to harass Plaintiff into paying the unlawful, non-contracted, non-obligated and fraudulent alleged debt when on December 20, 2016, Defendants Kunert and Kunert Realty sent the Plaintiff the following email: **"Nye, please see email below and attachment. ANDREAS KUNERT, KUNERT REALTY,INC, Andy, Please find attached received from NES for unit #2403 Nye Lavalle I have paid $979.24 and will be paying $101.35 next week for the service till November-24-2016 Please ask tenant (Nye Lavalle) to issue a check ASAP for $1080.59. Best Regards, BIMAL FERNANDO."**

2.  Virtually, in an identical fashion as Defendant NES, Defendants Kunert, Kunert Realty and Fernando demand that Plaintiff pay an unlawful, non-contracted, fraudulent debt with no supporting documentation whatsoever to a party who is not even now believed to be the owner.

3.  Defendant Fernando appears not to understand the distinction of the creation of differing legal entities to hold his real estate holdings to avoid various liabilities, but conflates personal ownership with ownership by a separate and distinct LLC, being Defendant ABS, whose ownership and interest in the property was intentionally concealed by Defendants Kunert, Kunert Realty and Fernando from Plaintiff and Pew for almost two years.

4.  As a point of reference, despite being paid over $55,000.00 in payments and holding a $2500.00 security deposit and Plaintiff and Pew not calling on Defendants Kunert and Kunert Realty or Fernando to repair one item in two

years and investing several thousands of dollars in new carpeting in the unit, new light and plumbing fixtures; new ceiling fan, new paint, new window dressings, all paid for by the Plaintiff, Defendants Kunert, Kunert Realty, and Fernando were causing all of this distress, stress, hassle and breaches of their agreements over an approximate $1000.00 unlawful, non-contracted, non-obligated and fraudulent alleged debt that they had full and complete and admitted knowledge was: not Plaintiff's debt; was unlawfully and fraudulently created; and that Plaintiff had legal claims to.

5.    Defendants Fernando and ABS USA Int'l had no right to interfere with Plaintiff's legal claims and due process rights by their tortuous conduct and not only falsely admitting a non-contracted, non-obligated and fraudulent alleged debt in Plaintiff's name, but then demanding payment and collection of the unlawful debt they satisfied against Plaintiff's explicit instructions.

6.    Defendants Fernando, Kunert Realty and Kunert were taking unreasonable, bad faith, and unlawful actions and threats to collect admittedly fraudulent, deceptive, and unlawful billings to the Plaintiff that Plaintiff in his fiduciary capacity could not approve payment for without the supporting documentation.

## IX.    SUB-METERING'S CREATION & INITIAL REGULATORY FRAMEWORK

A.    Sub-Metering Genesis & History

1.    The energy crisis in the 1970s, a time of oil embargoes and growing concern over energy costs and conservation, led to the trend of charging tenants separately for energy as opposed to including the costs in the rent.[22] A similar

---

[22] NCLC, Access to Utility Service, (2nd Ed. & 2003 Supp.), § 5.5.2.2; Leta Herman, "Landlords Go With the Flow to Save Costs By Having Tenants Pay For Water," Washington Post, March 3, 2001; Marc Treitler, "Submetering: What You Don't Know Can Cost You," Units, National Apartment Association, July 1, 2000.

trend has started to emerge in recent years for water and sewer bills.[23] This trend to have tenants pay for water and sewer separate from rent is driven by factors similar to those that drove apartment owners to separate energy costs from rent back in the 1970s.

2.     There are basically four ways a tenant can pay for water and sewer service: 1) to the landlord through the rent; 2) to the landlord or billing agent through a separate bill based on a submeter; 3) to the landlord or billing agent through an allocation formula (also called ratio utility billing system or RUBS); and 4) directly to the water and sewer utility (where the unit is individually metered).[24]

3.     Over the last two decades, apartment owners and homeowners associations and the submetering/RUBS industry have advocated for the removal of barriers to the use of submetering and RUBS by citing to a 1999 study linking water conservation and submetering/RUBS by Industrial Economics, Inc. for the National Apartment Association and the National Multi- Housing Council.[25] Their analysis reflected that tenants in submetered units used 18-39 percent less water and tenants billed through RUBS used 6-27 percent less than those paying for water in their rent.[26]

4.     The apartment, HOA and submetering industry argue that submetering and RUBS leads to water conservation and a reduction in the amount of wastewater that needs to be treated. Submetering companies' websites, such as Defendant

---

[23] Seattle City Council News Release, "Council Considers Legislation on Third-Party Water Billing," September 9, 2003; "Getting Involved: Council taking comment on billing of renters," Seattle Post-Intelligencer, September 22, 2003; Erica C. Barnett, "Wrung Dry: Ratepayers Complain About Water Bills," The Stranger.com, May 8 – May 14, 2003; Jason Song, "Asking If Water Meters Matter," Baltimore Sun, August 26, 2002; Matt Williams, " Metered Tenants Cut Back Water Use; New Regulations Allow Landlords to Charge Residents for Water," Greensboro News & Record, July 24, 2002; "Santa Ana-based billing service finds its niche," The Orange County Register, March 21, 2002; Andrew LePage, " California Apartment Group Backs Proposal to Bill Tenants for Water," The Sacramento Bee, April 19, 2001; Chris Helms, "Apartment Water Issue Goes to City Officials," Greensboro News & Record, October 14, 2000.
[24] Wein, Olivia, and Charlie Harak. *Soaking Tenants: Billing Tenants Directly For Water and Sewer Services.* Rep. Boston, MA: National Consumer Law Center, 2003. NCLC's Energy & Utility Update. *Www.nclc.org.* National Consumer Law Center, Fall 2003. Web. 2 Jan. 2017. <https://www.nclc.org/images/pdf/energy_utility_telecom/water/report.pdf>.
[25] Doug Koplow and Alexi Lownie, Industrial Economics, Inc., Submetering, RUBS, and Water Conservation (June 1999).
[26] Id. at 7-8.

NES' website,[27] market, sell and promote their submetering, billing and collection services to developers and HOAs by also arguing that shifting water and sewer costs to tenants will increase the reporting of leaks, leading to a better maintained building; it "insulates the property owner from the uncontrollable rise in water and sewer expense;" it also "increases the property's net operating income;"[28] and it makes the landlord's "base rent more competitive."[29]

5.    The US EPA also expressed its doubts about the conservation claims of RUBS proponents when it declined to include properties billing with RUBS in its recent policy change concerning the applicability of the Safe Drinking Water Act on submetered properties.[30]

6.    Whether or not a landlord can submeter or use RUBS to shift the cost of water and sewer directly to the tenant will depend on local and state laws.[31]

7.    Until just about a decade ago, federal environmental policy concerning the submetering of water to tenants under the Safe Drinking Water Act treated certain apartment owners who submeter as public water systems subject to regulations of the Safe Drinking Water Act.[32]In August 2003, the US EPA started a proceeding to modify this policy. In interpreting section 1411 of the Safe Drinking Water Act (42 U.S.C. § 300g), US EPA staff and program managers have issued several memoranda stating that an apartment owner with

---

[27] *See* https://www.submeter.com/submetering/
[28] Utility Billing Systems Would Create Significant Reductions in Water Use and Wastewater Production, Fact Sheet Regarding Billing the Residents of Rental Housing for Water and Sewer Services, Submitted by Edwin Shanahan, Greater Boston Real Estate Board, To Massachusetts legislature, April 3, 2002 (on file at NCLC). See also, Inovonics Wireless Corporation at www.inovonics.com/submetering /whySubmetering.jsp; Sage Water at www.sagewaterusa. com/sub_reasons.html, Omega Utility Services at www.omegautilities.com/WhySubmeter.html .
[29] Omega Utility Services at www.omega-utilities.com/WhySubmeter.html. See also, Sage Water at www.sagewater-usa.com/sub_reasons.html; Inovonics Wireless Corporation at www.inovonics.com/submetering/whySubmetering.jsp.
[30] "Water savings, if any, from RUBS and hot water hybrid billing systems (HWH) are uncertain. At this time, EPA believes that RUBS or other allocation billing systems do not meet the definition of submetering, as used in this policy, and do not encourage water conservation." 68 Fed. Reg. 74235 (Dec. 23, 2003)(emphasis added).
[31] Wein, Olivia, and Charlie Harak. *Soaking Tenants: Billing Tenants Directly For Water and Sewer Services.* Rep. Boston, MA: National Consumer Law Center, 2003. NCLC's Energy & Utility Update. *Www.nclc.org.* National Consumer Law Center, Fall 2003. Web. 2 Jan. 2017. <https://www.nclc.org/images/pdf/energy_utility_telecom/water/report.pdf>.
[32] US EPA request for comments on the applicability of the Safe Drinking Water Act to Submetered Properties, 68 Fed. Reg. 51777-51780 (Aug. 28, 2003).

a building having 15 service connections or regularly serving water to at least 25 people (the definition of a public water system under the Safe Drinking Water Act) who bills tenants separately for water is "selling" water and thus independently subject to the Safe Drinking Water Act's regulations.[33] In an effort to promote water conservation in apartment buildings, the US EPA proposed revising its policy on submetering apartments so that apartment owners, not otherwise subject to the Safe Drinking Water Act regulations, whose buildings receive water from regulated *public water systems and who use submeters to bill tenants directly for water are exempt from full Safe Drinking Water Act* requirements.[34] However, the property is still considered a Public Water System under the Safe Drinking Water Act, and the US EPA could still use the Act's emergency powers provision to address a public heath risk in the building.[35] On December 23, 2003, the US EPA finalized its proposed policy change to the applicability of the Safe Drinking Water Act on submetered properties,[36] but declined to expand the exemption to properties using billing allocation systems such as RUBS.[37]

8.    Developers, HOAs and the submetering industry have long advocated for directly shifting the costs of water and sewer bills onto tenants in order to promote conservation. There is merit to this argument in the case of submetering, of it is conducted properly and lawfully. However, this proposition is far more difficult when it relates to the use of RUBS for water or other utilities. Allocation and recoupment formulas based on factors such as the

---

[33] 68 Fed. Reg. at 51778 (Aug. 28, 2003).
[34] Draft US EPA Memorandum, 68 Fed. Reg. at 51778-51779 (Aug. 28, 2003).
[35] Draft US EPA Memorandum, 68 Fed. Reg. at 51779 (Aug. 28, 2003).
[36] 68 Fed. Reg. 74233 – 74255 (Dec. 23, 2003).
[37] 68 Fed. Reg. at 74235 (Dec. 23, 2003).

number of occupants, the number of bedrooms, square footage, and individually metered hot or cold water usage are very problematic.

9.      These are proxies for water usage and consequently sewer usage and fail to capture the vast range of actual water usage from household to household. For example, an allocation formula based on the number of occupants does not account for how much time tenants actually spend in a unit. A tenant who spends much of her time on the road for work will very likely use less water and sewer service than a tenant who works out of her unit. An allocation based on square footage could unfairly charge a senior living alone in a 2-bedroom unit the same as a young family of four where one parent and two young children remain at home most of the time. Indeed, under RUBS, a household that makes extra efforts to conserve water will not be paying a water bill that reflects those actual savings.

10.     Some states have enacted laws that exempt landlords who submeter water to tenants from state water quality regulations. For example, Florida's statute on the regulation of water and wastewater systems exempts from regulation as a utility "landlords providing service to tenants without specific compensation for the service."[38] "Any person who resells water or wastewater service at a rate or charge which does not exceed the actual purchase price of the water or wastewater" is also exempt.[39] In 1999, the Florida legislature amended the later exemption to *eliminate an annual requirement that resellers file with the utility commission a list of charges and rates for water sold and the source and actual price of the water and also the requirement that the meters are subject to testing*

---

[38] Fl. St. §367.022(5).
[39] Fl. St. §367.022(8).

*at a price set by the commission.*[40]

11.  Allowing developers and HOA to submeter and bill water usage opens a
     Pandora's box of billing, deceptive and fraud problems. What will the monthly
     bill entail? In condominiums, are owners or tenants legally responsible for the
     submeter bill? Will each submeter measure only usage in each individual condo
     or apartment? Eill tenants or owners be able to know if there is any cross-
     metering between apartments or common-area usage (e.g., outdoor water) being
     added onto bills? How can tenants and owners make sure that the HOA or
     developer are not marking up the bills or receiving kickbacks from submetering
     firms who collect o more from the tenants or owners than the actual amount the
     HOA or developer pays to the water company? What will stop an unscrupulous
     HOA or developer from overcharging? How will disputes over any of these
     issues be resolved?

12.  Regarding this last point, the "Best Practices Guidelines" supported by the
     National Submetering and Utility Allocation Association references little more
     than this: "Resident Complaints. Methods shall be specified to express and
     resolve complaints regarding he billing service.[41]

13.  HOA, developers and apartment owners are eager to shift to tenants the costs of
     water and sewer services. In almost every state, they can do so subject to
     varying statutory or regulatory restrictions. Because the practice of submetering
     and RUBS intersects with many areas of law (e.g., Safe Drinking Water Act,
     landlord-tenant law, and the regulation of public water systems) the submetering
     and RUBS laws can be housed in one or many parts of a state's codes. The

---

[40] 1999 Fla. Sess. Law Serv. Ch. 99-319 (West).
[41] The NSUAA Guidelines are on file with NCLC.

ability of tenants and their advocates to successful resist the switching of costs

to tenants or to deter and defend against unfair billing practices depends on each

state's regulations allowing submetering and/or RUBS.

## X.    PERTINENT FLORIDA LAW & EFFECTS ON SUBMETERING

A.    Florida Statutes Title XXVII, Railroads & Other Regulated Utilities

1.    Current Florida Statutes Title XXVII, Railroads & Other Regulated Utilities, in

Chapter 367 dealing with Water & Wastewater Systems provides certain

exemptions to qualified entities with regard to regulation and oversight of water

service and utilities in §367.022 titled Exemptions that reflects who is not

subject to regulation by the commission as a utility nor are subject to the

provisions of this Chapter 367. Specifically, pertinent to this matter are

§367.022 (5) that states: "*landlords providing service to their tenants without*

*specific compensation for the service*;" (7) "**nonprofit corporations,**

**associations, or cooperatives** <u>**providing service solely to members who own**</u>

<u>**and control such nonprofit corporations, associations, or cooperatives**</u>;" (8)

"**any person who resells water or wastewater service at a rate or charge**

**which does not exceed the actual purchase price of the water or**

**wastewater;**" and (9) "**any person who resells water service to his or her**

**tenants or to individually metered residents for a fee that does not exceed**

**the actual purchase price of the water plus the actual cost of meter reading**

**and billing, not to exceed 9 percent of the actual cost of service.**"

2.    Thus, in order to maintain the state imposed exemptions, NES nor the HOA

were lawfully allowed to mark up any water over the actual price paid and any

cost to read and bill Plaintiff's water could not exceed 9% of the actual cost of

service, which in this case would result in dimes, let along costs that ranged

from 75% to 1500% the actual cost of service, using Defendant's NES' existing

water charges without determination of any markups.

## XI.    WHAT SUB-METERING IS

A.    How Sub-Metering Should Work

1.    On it's website's FAQ section, Defendant NES states that: "*Submeters are

utility meters installed in individual dwelling units to measure the consumption

of each unit in a master-metered property.*"[42]

2.    On the Florida Community Association Professional's website Teresa Smetzer,

Defendant NES' VP of Business Development - Condos, Townhomes &

HOA's,[43] writes that: "*Submetering allows an association to account for each*

*unit's usage in measurable terms. A water meter about the size of a football is*

*installed in each unit on the existing water lines, and each meter is read by a*

*contracted third party. The third-party vendor can report the usage to the HOA*

*with options for billing and collections. By fairly billing each resident for their*

*portion, submetering promotes conservation and offsets the expense of the*

*municipal bill. The individual meters ensure that each unit pays only for its*

*actual usage.*"[44]

3.    The National Conference of State Legislatures identifies which states have

current regulations with regard to submetering utility bills and describes

submetering as:

"Utility submetering is the implementation of meter systems that allows
the operator of a multi-unit property to bill each unit for individual utility

---

[42] *See* https://www.submeter.com/faq/
[43] *See* https://www.linkedin.com/in/teresa-smetzer-70138943
[44] *See* http://www.fcapgroup.com/flcaj/flcaj-articles/hoa-getting-soaked-free-water

usage through the installation of additional meters behind a utility meter. Submetering can be managed by a third-party entity that does not produce electricity, gas or water but resells utilities to the customers behind the utility meter. Utility submetering can also be the installation of an additional meter on the customer side of a utility meter to obtain data about a specific end use or uses inside a facility. Utilities may install these meters on specific appliances as part of utility-managed interruptible service rates or demand response. Submetering differs from master-metering, where a landlord purchases energy at a commercial customer rate and then sub-meters electricity to tenants at a residential or smaller commercial rate. Twenty-two states, three counties and Washington, D.C., have statutes, regulations, or rulings on utility submetering, as shown in the table below. Several local ordinances are also included in the chart below. While state approaches to utility submetering vary, polices may establish provisions for acceptable uses of submetering in properties, create a mechanism for determining customers charges, and determine if building owners may charge customers additional fees."

4.    In essence, sub-metering companies like Defendant NES contract with HOA and real estate developers to take a portion of the HOA or developers "debt obligation" for utilities and apportion all or part of such debt onto the tenants and owners by using sub-meters, separate of the master utility meters for a building, an claim they measure the "individual usage" for each "individual meter."

5.    Often, they install meters at a cost and may finance the meters via financing arrangements with the HOA or developer.

6.    Defendant NES then via some contract and/or financing arrangement, as indicated in the $2.16 "finance fee" listed on Plaintiff's NES statements, creates a new alleged debt obligation for Plaintiff and other consumers on behalf of the HOA or developer.

7.    If not paid and even if disputed, then Defendant NES uses its Collection Department to conduct aggressive collection actions against those like Plaintiff, who did not pay or are disputing the obligation.

8.    Simply, NES' business model is to: 1) install and/or read sub-meters; 2) bill persons such as Plaintiff for their utility use in some form of an undisclosed and concealed formulaic, algorithmic, mathematic unit measure and/or apportionment basis; 3) institute traditional bill collection measures on the collection of unpaid or disputed bills acting as a third and really a fourth party bill collector in that the actual bills being paid are the master utility company.

9.    Based on existing research, investigation, information and belief, and likely to have more evidentiary value after discovery, Defendant NES participates with HOAs and developers in marking-up usage, fees and working with such persons by kicking back to the developer or HOA part of the excess collected in charges and fees to assist HOA and developers in supplement budget shortfalls and keeping HOAs from having to increase assessments to their owners that may be voted down.

## XII.    BEST PRACTICES FOR SUBMETERING INDUSTRY BILLING

A.    National Multiple Family Submetering And Allocation Billing Program Study

1.    In 2004, a study and resulting paper titled the National Multiple Family Submetering And Allocation Billing Program Study was produced for distribution.

2.    The study, pertinent excerpts are attached as Exhibit F, was funded by the following agencies and organizations: United States Environmental Protection Agency, National Apartment Association, National Multi Housing Council, City of Austin, City of Phoenix, City of Portland, City of Tucson, Denver Water Department, East Bay Municipal Utility District, San Antonio Water System, San Diego County Water Authority, Seattle Public Utilities, and Southern

Nevada Water Authority.

3.      As part of the study, the authors recommended a number of "best practices" to

address many of the abuses, deceptive practices, and fraudulent submetering

and utility practices occurring across the nation and in order to prevent

additional government regulation.

4.      In their report on the study, the authors wrote that:

>    "The researchers believe a *comprehensive set of best practices* in the
>    form of *regulated industry standards*, would benefit all parties involved,
>    *including residents, property owners, water providers, regulators, and the
>    billing service providers themselves*. The best management practices
>    (BMPs) should be implemented by the appropriate regulatory oversight
>    agencies. *BMP standards could greatly improve resident understanding
>    and satisfaction with third party billing, and reduce consumer complaints
>    to regulators*.
>
>    Based on the research results, the following standards for best
>    management practices for water and wastewater billing practices are
>    recommended. BMPs for the billing service industry and for property
>    owners are essentially the same and apply equally. In many cases,
>    property owners and managers handle their own billing for water and are
>    in fact the billing entity. Regardless of who produces the bill, either the
>    owner/manager or a third party billing service company, it is incumbent
>    upon the owner/manager to ensure the proper implementation of these best
>    management practices. The owner maintains the underlying responsibility
>    for the way the billing program is implemented and managed.
>
>    Resident rights related to water billing are closely tied to the BMPs
>    for the water billing industry and provide a set of reasonable expectations
>    for residents receiving water and wastewater bills from largely
>    unregulated billing entities.
>
>    These best practices are intended to apply generally to both
>    submetering and RUBS billing unless specifically noted:
>
>    1) **Billing entity**. Where permitted by law, water and wastewater
>       utility bills may be issued by a property owner or qualified billing
>       agent. Billing agents shall have appropriate insurance coverage.
>
>    2) **Water cannot be dedicated to public use**. Water and wastewater
>       service will only be provided to residents of the property. Non-
>       residents and the general public will not be served. (In many states,
>       this ensures that the property owner is not deemed to be a public
>       utility).
>
>    3) **Common area and vacant units**. The property owner shall pay

for water and wastewater service used in common areas, administrative offices, vacant dwelling units, and other portions of the property not designated as dwelling units. Residents are only financially responsible for their own water and wastewater service costs. In RUBS properties, common areas should be separately metered. If not possible, a reasonable estimate of common area usage can be made that is based on the property's specific common area amenities.

4) **Water audit and leak repair**. Before instituting any separate billing system, the property owner/manager shall conduct a water audit of all units and common areas, testing for leaks, including toilet tank flapper valve leaks, and repair all leaks identified. Upon institution of the separate billing system, the property owner/manager shall commit to a reasonable standard of leak repair in all units, and shall maintain sufficient supplies of materials as may be necessary to ensure that common types of leaks (such as toilet flappers) are promptly repaired. When properly reported, non-emergency leakage at any plumbing fixture or fitting should be repaired within 5 business days. The process for reporting leaks and the owner/manager's commitment to leak repair shall be clearly stated in each resident's bill, and shall also be disclosed as part of the lease agreement.

5) **Pass through of water and wastewater costs**. Both the commodity and fixed service charges for water and wastewater shall be equivalent to the commodity charges contained in the property owner's bill from the local water and wastewater utility.[45] Neither the billing entity nor the owner/manager shall inflate the costs of these charges. Utility commodity charges and the billing entity charges shall be clearly stated on every bill provided to residents and such rates and charges shall also be disclosed as part of the rental agreement.

6) **Submetering and RUBS methods and notification**. Water and wastewater bills to residents shall be calculated on the basis of fair and reasonable methods of cost allocation, including submeter readings or allocation formulas. The measurement or allocation method and/or formula is considered a matter of public record and shall be clearly stated on every bill provided to residents. The water and wastewater billing arrangement shall be fully disclosed to the resident in the rental agreement. When a new billing program is started, owners shall provide residents with at least 60 days notice prior to implementation. Billing can only begin after lease signing/renewal.

---

[45] In most cases, these charges will be based on the local utilities' rate schedules for multifamily housing, often priced by the size of the service connection to the master meter. In the case of duplex, 3-family, and 4-family units, the smaller service connections to these structures may result in their being charged at the same rate as single-family residences.

7) **Billing practices.** Water and wastewater bills shall be sent promptly after meter readings are made or after the master-meter bill from the utility is received. This is essential to ensure that the price signal is received in reasonably close proximity to the time of consumption. A reasonable amount of time (minimum of 10 business days) shall be allotted between the residents' receipt of a bill and the date payment is due.

8) **Records retention and inspection.** The property's master water and wastewater utility bills shall be retained for a period of not less than 24 months, and shall be available for inspection by any resident at reasonable hours and without charge. However, a nominal fee can be charged for any requests to copy bills.

9) **Fees.** The billing entity may charge reasonable fees. Fees are divided into two categories: (a) recurring service fees; and (b) other fees. Recurring service fees (also called monthly fees, administrative fees, or meter fees) shall be charged to the property owner/property manager, not to the residents. Where not subject to regulation, the owner is in the best position to negotiate favorable service fee charges with the billing company and responsibility for recurring service fees gives the owner an interest in negotiating the best fee. Property owners should pay the meter service fee since it is part of the infrastructure of the building and as such would be like repair and maintenance of any building supplied fixture or appliance. Other fees (new account fees, late fees, returned check fees, and other reasonable fees that relate to a specific resident account) shall be paid by the residents.

10) **Complaints and disputes.** A fair method for promptly resolving complaints and billing disputes shall be established by the billing entity that should have parity to the process that exists for the property owner contesting a bill to the local water utility. The billing entity shall be available during normal business hours via a toll free number, printed on every bill, to handle billing questions and complaints.

11) **No shutoff of service.** As stated by law, water and wastewater service cannot be shutoff to residents by the owner or his agents. The rental agreement can provide for a utility deposit or other legal remedy through which unpaid utility bills can be collected.

12) **Information to be included in regular bills.** The bill is the fundamental communication between the billing entity and the resident. As such, bills must be clear, comprehensible, and comprehensive. Billing entity water and wastewater bills shall include:

    a. Clear statement of the current water and wastewater

commodity charges and fees as well as any overdue or pending amounts;

b. Billing period covered by the bill;

c. Date payment is due;

d. Date after which payment is overdue;

e. Explanation of the billing method (Submetering, RUBS, hybrid);

f. Explanation of how charges are determined for current billing period. For submetering this will simply be a beginning and ending meter read, the volume consumed, and the commodity rate per unit volume. For hybrid metering this will be a beginning and ending meter read, the (hot or cold water) volume consumed, the calculation for allocating the remaining water volume, and the commodity rate per unit volume. For RUBS this should include the total volume of water used at the property (as measured by the utility at the master meter(s)), the deductions for common area, the percent of remaining amount allocated to the individual unit, the volume allocated to the unit, and the commodity rate per unit volume.

g. Utility commodity charges and the billing entity commodity charges (to assure equivalence);

h. Information for reporting leaks;

i. Toll free or local telephone number for customer complaints and billing disputes, and a brief description of the dispute resolution process.

## XIII.   ONE EXAMPLE OF GOOD TRANSPARENCY

A.    An NES Client in VA Discloses Relevant Information to Tenants

1.    In Plaintiff's research for this action, Plaintiff identified an apartment community in Virginia that clearly identifies in both its leases and website how utilities are managed, billed for and collected by Defendant NES.

2.    As shown in the attached Exhibit G, a print of the website, it should be rather easy for Defendants NES, Fernando and others to be transparent and explain to occupants, residents, lessors and renters how utilities are being measured, collected, and divided. On their website, the Queen & King Apartments write:

All tenants at King & Queen Apartments **are responsible for their apartment utility bills and charges.  Tenants are responsible for the**

cost of utilities noted on page 1 of the Lease during the Lease term
**(from the when your lease starts to when it ends)**.  These utilities, found
in Paragraph 1, include: electric, heat (which includes heating of the
apartment and heat for providing instant hot water), cable and Internet.

King & Queen Apartments, LLC has contracted **National
Exemption Service ("NES"), a utility billing service, to serve as the
heating, hot water and electrical-metering and utility billing
agent**.  NES handles and collects all apartment utility bills and charges
for King & Queen Apartments.

The payments are to be mailed to National Exemption Service: P.O
Box 9020. Clearwater, FL, 33758-9020.



NES bills each apartment individually on a monthly basis. Bills are
emailed directly to each tenant every month.  Remember that, according to
the lease agreement, tenants have agreed to pay their NES account, and to
keep it in a good standing.

**Each Lease Agreement allows for both energy sub-metering
and ratio utility billing.**  Each apartment is individually sub-metered to
calculate the use of electricity and heat/hot air.

**The heating of hot water is divided up between apartments
using a method called Ratio Utility Billing or ("RUBs").**  Each
apartment is charged for the cost to heat and use instant hot water in the
apartment.  This calculation is based on the number of occupants in the
unit.  The use of energy sub-metering and ratio utility billing are both
explained in your lease in Paragraph 7.

**There is no charge for hooking-up the electrical and heat/hot
water services.  You do not need to contact the power company or
local water/utility service.**

Each tenant receives a bill for the individual apartment utility bills
and charges that were used in a specific billing cycle.  These bills and
charges reimburse the Owner for the cost of the utilities.

Please **click here** for information that will help you to better
understand your statement.

Your utility bill from NES includes the following information and
charges:

- Number of Tenants on the Lease.
- Electricity Usage
- Electricity Charge/kWh
- Heat Usage Charge (using timed hours used)
- Hot Water Charge (using RUBs)
- **Billing Fee\***

- **One Time Set Up Fee\***
- Total New Charges
- Any NSF Charges
- Any Late Charges
- Total Charges for that month
- Total Received by NES
- Balance Due

**\* the monthly Billing Fee is currently $5 per apartment and NES charges a One Time Set Up Fee of $10 to all newly occupied apartments.**

Paying NES promptly, in full, for the amounts of the utility bills, prior to the due date/term noted on the bill, will avoid further penalty and/or action. **Per allowable Virginia law, a late fee of $5.00 per utility payment will be assessed to all payments received after the due date. Utility bills are considered additional rent.**

Any damage caused to the sub-metering equipment installed in your apartment will be repaired and you will be charged the cost of repair.

If you would like to change your email address or receive a paper bill for an additional $0.49/month, please contact **NES Customer Service at 1-800-488 1748.**

**NES's office hours are Monday through Friday, 9:00 am to 5:00pm.**

**For your convenience, you may make your payments using the following options:**

Mail in a Check or Money Order.
Automated Phone Payment Service using 1-877-UTIL-PAY(1 877-884-5729).

A nominal service fee of $4.00 will be charged to your credit card at the time of the transaction.
Web-pay is also available at: www.submeter.com and registering at the website. All major credit cards are accepted. \*A nominal service fee of $3.50 will be charged at the time of the transaction.
All payments by Check or Money Order should be made payable and mailed to: **NATIONAL EXEMPTION SERVICE PO Box 9020 Clearwater, FL 33758-9020.**

Should you have any further questions, please contact NES at 1-800-488-1748 or via the web at www.submeter.om, choose "Corporate" on the menu bar and click "contact us".

Neither King & Queen Apartments nor Howard Hanna William E. Wood are to be held responsible for any discrepancies including, but not limited to, monthly billing or the receiving and crediting of tenants' payments on an account.

## XIV.   DEFENDANT NES' LATE FEE SCHEME

A.    Churning & Pyramiding Late Fees

1.    Plaintiff took occupancy of Unit 2403 on or about February 18, 2015.

2.    NES' records, despite disputes to NES, falsely claim that Plaintiff took over occupancy of Unit 2403 in March of 2014, almost a year earlier than his occupancy.

3.    The first collection attempt by NES sent to Plaintiff by postcard in March of 2015 claim Plaintiff owed Defendant NES, $390.96 as of March 24, 2015.

4.    Of the total of $390.96 as of March 24, 2015, $155.75 was claimed for "late charges," $214.56 for "total charges" in addition to the monthly $2.16 late fee.

5.    Plaintiff's February 24, 2015 to March 24, 2015 alleged water usage was charge was 700 gallons with a water charge of $3.93 and a sewer charge of $6.16 for a total monthly charge of $10.09 for which a cumulative late charge of $155.75 was imposed on the amount of $10.09 of Plaintiff's alleged and presumed obligation. This would make such a claimed late charge over 1500% over any presumed obligation of the Plaintiff.

6.    Defendant NES for two years refused to fix or remedy their fraudulent charges, assessments and cease their collection efforts.

7.    Using the imposition of $15.00 late fee, prior to the Plaintiff's due date obligation would reflect that the payment of $15.00 in late fees for an approximate $10.00 alleged obligation, would reflect the late fee to be 150% of the obligation.

8.    Florida law permits a retail installment contract lender to impose a late fee as

follows: Section 520.37 of Florida Statutes states: "A retail installment contract may provide for payment by the buyer of a delinquency charge on each installment in default for a period not less than 10 days. Such charge may not exceed 5 percent of such installment. A retail installment contract or a revolving account may provide for the payment of reasonable attorney's fees if referred for collection to an attorney not a salaried employee of the retail seller and for the payment of court costs."

9. Further, landlords and certain creditors are authorized to impose a late fee pursuant to Section 687.03(2)(c), Florida Statutes: "Notwithstanding any other provision of this section, any lessor or merchant, or any person who lends money or extends any other form of credit, who is regularly engaged in the business of selling or leasing merchandise, goods, or services which are for other than personal, family, or household purposes, or any assignee of such lessor, merchant, or person who lends money or extends any other form of credit, who is the holder of a commercial installment contract, each of which persons or entities is subject to the laws of any jurisdiction of the United States, any state, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or insular possession of the United States, may, if the contract so provides, charge a delinquency charge on each installment which is in default for a period of not less than 10 days in an amount not in excess of 5 percent of such installment. However, only one such delinquency charge may be collected on any installment, regardless of the period during which it remains in default. A delinquency charge imposed pursuant to this paragraph shall not be deemed interest or a finance charge made incident to or as a condition to the grant of the loan or other extension of credit and shall not be included in determining the

limit on charges, as provided by this section, which may be made in connection with the loan or other extension of credit as provided by law of this state." (emphasis added)

10.    Reflective of other similar late fees charged on a cumulatively monthly basis was cumulative late charge of $221.50 being imposed on for the service month of July 24, 2015 and a total cumulative sewer and water charge of $294.50.

11.    Assuming arguendo that Plaintiff was somehow contractually or lawfully bound in some unknown legal manner for these debt obligations, the amounts being charged for late fees is approximately 75% of the total due from March of 2014 to July of 2015.

12.    Besides being a usurious rate, it's unconscionable that any of these late fee rates, from 75% to 150% to %1500 in comparison to any lawful obligation owed by Plaintiff, could be reasonable and lawful.

## XV.   DEFENDANT NES' UNFAIR, DECEPTIVE, & ABUSIVE ACTS & PRACTICES HARMED PLAINTIFF, PEW, HOA & PUBLIC

A.    Dodd-Frank Act & Guidance Provide Understanding of Abusive Collection Practices

1.    While Defendant NES is a debt collector under the Fair Debt Collection Practices Act, it is not considered an entity providing financial services to consumers under the Dodd-Frank Act.

2.    However, the abuses of debt collectors for financial products under the Dodd-Frank Act and the incumbent regulation as to mortgage servicers that Plaintiff was instrumental in creating, provide a relevant background as to the actions of the Defendants in this matter, especially in conjunction with the claims being exerted in Plaintiff's claims pursuant to the Florida Deceptive and Unfair Trade

Practices Act, Florida Statutes §501.201, et seq. (hereinafter "the FDUTPA") against Defendants NES, Kunert Realty, Kunert and Fernando.

3.     In Florida Statute § 501.203 (3) defining the "*Violation of this part*" means any violation of this act or the rules adopted under this act and may be based upon any of the following as of July 1, 2015: (a) Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. ss. 41 et seq.; (b) The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts; or (c) **Any *law, statute, <u>rule</u>, <u>regulation</u>, or ordinance which proscribes unfair methods of competition, <u>or unfair,</u> <u>deceptive, or unconscionable acts or practices</u>.***

4.     Thus, the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) provides Plaintiff, the Court and Defendants with guidance on what are commonly referred to as unfair, deceptive, or abusive acts or practices (collectively, UDAAPs) in violation of the Dodd-Frank Act and incorporates In Florida Statute § 501.203 (3) (c).

5.     Under the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), all covered persons or service providers are legally required to refrain from committing unfair, deceptive, or abusive acts or practices (collectively, UDAAPs) in violation of the Act. The Consumer Financial Protection Bureau (CFPB or Bureau).

6.     The CFPB issued a bulletin that clarified the contours of that obligation in the context of collecting consumer debts. The bulletin described certain acts or practices related to the collection of consumer debt that could, depending on the facts and circumstances, constitute UDAAPs prohibited by the Dodd-Frank Act.

Whether conduct like that described in the bulletin constitutes a UDAAP may depend on additional facts and analysis.

7.    However, examples described in the bulletin are not exhaustive of all potential UDAAPs. Yet, the CFPB bulletin provides both the Court and each Defendant with a framework in which to weigh and judge the acts and incumbent liability of each of the named defendants in this matter.

8.    UDAAPs cause significant financial injury to consumers, erode consumer confidence, and undermine fair competition in the financial marketplace. Original creditors and other covered persons and service providers under the Dodd-Frank Act involved in collecting debt related to any consumer financial product or service are subject to the prohibition against UDAAPs in the Dodd-Frank Act.[46] In addition to the prohibition of UDAAPs under the Dodd-Frank Act, the Fair Debt Collection Practices Act (FDCPA) also makes it illegal for a person defined as a "debt collector" from engaging in conduct "the natural consequence of which is to *harass, oppress, or abuse* any person in connection with the collection of a debt,"[47] to "use *any false, deceptive, or misleading representation* or means in connection with the collection of any debt,"[48] or to "*use any unfair or unconscionable means* to collect or attempt to collect any debt."[49]

9.    The FDCPA generally applies to third-party debt collectors, such as collection

---

[46] *See* Dodd-Frank Act, §§ 1002, 1031 & 1036(a), codified at 12 U.S.C. §§ 5481, 5531 & 5536(a). It is also prohibited for any person, even if not a covered person or service provider, to knowingly or recklessly provide substantial assistance to a covered person or service provider in violating section 1031 of the Dodd-Frank Act. *See* Dodd-Frank Act, § 1036(a)(3), 12 U.S.C. § 5536(a)(3). The principles of "unfair" and "deceptive" practices in the Act are informed by the standards for the same terms under Section 5 of the Federal Trade Commission Act (FTC Act). *See* CFPB Examination Manual v.2 (Oct. 2012) at UDAAP 1 (CFPB Exam Manual). To the extent that this Bulletin cites FTC guidance or authority, such references reflect the views of the FTC, and are not binding upon the Bureau in interpreting the Dodd-Frank Act's prohibition on UDAAPs.
[47] FDCPA § 806, 15 U.S.C. § 1692d.
[48] FDCPA § 807, 15 U.S.C. § 1692e. This provision also imposes affirmative obligations on "debt collectors" under the FDCPA when collecting consumer debts.
[49] FDCPA § 808, 15 U.S.C. § 1692f. This provision also imposes affirmative obligations on "debt collectors" under the FDCPA when collecting consumer debts.

agencies, debt purchasers, and attorneys who are regularly engaged in debt collection.[50] All parties covered by the FDCPA must comply with any obligations they have under the FDCPA, in addition to any obligations to refrain from UDAAPs in violation of the Dodd-Frank Act. Although the FDCPA's definition of "debt collector" does not include some persons who collect consumer debt, all covered persons and service providers must refrain from committing UDAAPs in violation of the Dodd-Frank Act.

10.   This creates a nexus to Plaintiff's claims under the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §501.201, et seq. (hereinafter "FDUTPA").

B.   Unfair Acts & Practices Under Dodd-Frank

1.   The Dodd-Frank Act prohibits conduct that constitutes an unfair act or practice. An act or practice is unfair when:

a.   It causes or is likely to cause substantial injury to consumers;

b.   The injury is not reasonably avoidable by consumers; and

c.   The injury is not outweighed by countervailing benefits to consumers or to competition.[51]

2.   A "substantial injury" typically takes the form of monetary harm, such as fees or costs paid by consumers because of the unfair act or practice. However, the injury does not have to be monetary.[52] Although emotional impact and other subjective types of harm will not ordinarily amount to substantial injury, in certain circumstances emotional impacts may amount to or contribute to

---

[50] *See* FDCPA § 803(6), 15 U.S.C. § 1692a(6). The FDCPA also covers, as a "debt collector," a creditor who, in collecting its own debts, uses any name other than its own which would indicate that a third person is attempting to collect the debts.
[51] Dodd-Frank Act §§ 1031, 1036, 12 U.S.C. §§ 5531, 5536.
[52] CFPB Exam Manual at UDAAP 2; see also FTC v. Accusearch, Inc., 06-cv-105-D, 2007 WL 4356786, at *7-8 (D. Wyo. Sept. 28, 2007); FTC Policy Statement on Unfairness (Dec. 17, 1980), available at http://www.ftc.gov/bcp/policystmt/ad-unfair.htm.

substantial injury.[53]

3.   In addition, actual injury is not required; a significant risk of concrete harm is sufficient.[54]

4.   An injury is not reasonably avoidable by consumers when an act or practice interferes with or hinders a consumer's ability to make informed decisions or take action to avoid that injury.[55] Injury caused by transactions that occur without a consumer's knowledge or consent is not reasonably avoidable.[56]

5.   Injuries that can only be avoided by spending large amounts of money or other significant resources also may not be reasonably avoidable.[57] Finally, an act or practice is not unfair if the injury it causes or is likely to cause is outweighed by its consumer or competitive benefits.[58]

6.   Established public policy may be considered with all other evidence to determine whether an act or practice is unfair, but may not serve as the primary basis for such determination.[59]

C.   Deceptive Acts or Practices Under Dodd-Frank

1.   The Dodd-Frank Act also prohibits conduct that constitutes a deceptive act or practice. An act or practice is deceptive when:

a.   The act or practice misleads or is likely to mislead the consumer;

b.   The consumer's interpretation is reasonable under the circumstances; and

---

[53] CFPB Exam Manual at UDAAP 2.
[54] Id.
[55] Id.
[56] Id.
[57] See id. at 2-3.
[58] Dodd-Frank Act § 1031(c)(1)(B), 12 U.S.C. § 5531(c)(1)(B); see also CFPB Exam Manual at UDAAP 2.
[59] Dodd-Frank Act § 1031(c)(2), 12 U.S.C. § 5531(c)(2); see also CFPB Exam Manual at UDAAP 3.

       c.      The misleading act or practice is material.[60]

2.      The standard for "deceptive" practices in the Dodd-Frank Act is informed by the standards for the same terms under Section 5 of the FTC Act.[61]

3.      Thus, this also creates a nexus to Plaintiff's claims under the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §501.201, et seq. (hereinafter "FDUTPA").

4.      To determine whether an act or practice has actually misled or is likely to mislead a consumer, the totality of the circumstances is considered.[62] ***Deceptive acts or practices can take the form of a <u>representation</u> or <u>omission</u>.***[63] The Bureau also looks at *implied representations*, including any implications that statements about the consumer's debt can be supported. ***Ensuring that <u>claims are supported before they are made</u> will minimize the risk of omitting material information and/or making false statements that could mislead consumers.***

5.      To determine if the consumer's interpretation of the information was reasonable under the circumstances when representations target a specific audience, such as older Americans or financially distressed consumers, the communication may be considered from the perspective of a reasonable member of the target audience.[64]

6.      A statement or information can be misleading even if not all consumers, or not all consumers in the targeted group, would be misled, so long as a significant minority would be misled.[65] Likewise, if a representation conveys more than one meaning to reasonable consumers, one of which is false, the speaker may

---

[60] See CFPB Exam Manual at UDAAP 5
[61] *Id.*
[62] CFPB Exam Manual at UDAAP 5.
[63] *Id.*
[64] *See id.* at 6.
[65] *Id.*

still be liable for the misleading interpretation.[66]

7.    Material information is information that is likely to affect a consumer's choice of, or conduct regarding, the product or service. Information that is likely important to consumers is material.[67]

8.    Sometimes, a person may make a disclosure or other qualifying statement that might prevent consumers from being misled by a representation or omission that, on its own, would be deceptive. The Bureau looks to the following factors in assessing whether the disclosure or other qualifying statement is adequate to prevent the deception: whether the disclosure is prominent enough for a consumer to notice; whether the information is presented in a clear and easy to understand format; the placement of the information; and the proximity of the information to the other claims it qualifies.[68]

D.    Abusive Acts or Practices

1.    The Dodd-Frank Act also prohibits conduct that constitutes an abusive act or practice. An act or practice is abusive when it:

a.    Materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

b.    Takes unreasonable advantage of – a) a consumer's lack of understanding of the material risks, costs, or conditions of the product or service; b) a consumer's inability to protect his or her interests in selecting or using a consumer financial product or service; or c) a consumer's reasonable reliance on a covered person to act in his or her

---

[66] Id.
[67] Id.
[68] Id.

interests.[69]

2.    It is important to note that, although abusive acts or practices may also be unfair or deceptive, each of these prohibitions are separate and distinct, and are governed by separate legal standards.[70]

E.    Examples of Unfair, Deceptive and/or Abusive Acts or Practices

1.    Depending on the facts and circumstances, the following non-exhaustive list of examples of conduct related to the collection of consumer debt that could constitute UDAAPs:

a.    Collecting or assessing a debt and/or any additional amounts in connection with a debt (including interest, fees, and charges) not expressly authorized by the agreement creating the debt or permitted by law.[71]

b.    Revealing the consumer's debt, without the consumer's consent, to the consumer's employer and/or co-workers.[72]

c.    **Falsely representing the character, amount, or legal status of the debt.**

2.    Threatening any action that is not intended or the covered person or service provider does not have the authorization to pursue.

---

[69] Dodd-Frank Act § 1031(d), 12 U.S.C. § 5531(d); see also CFPB Exam Manual at UDAAP 9; Stipulated Final Judgment and Order, Conclusions of Law ¶ 12, 9:13-cv-80548 and Compl. ¶¶ 55-63, CFPB v. Am. Debt Settlement Solutions, Inc. , 9:13-cv-80548 (S.D. Fla. May 30, 2013), available at http://files.consumerfinance.gov/f/201305_cfpb_proposed-order_adss.pdf and http://files.consumerfinance.gov/f/201305_cfpb_complaint_adss.pdf. The Stipulated Final Judgment and Order was signed by U.S. District Judge Middlebrooks and entered on the court docket on June 6, 2013. See Stipulated Final J. & Order [ECF Docket Entry No. 5], 9:13-cv-80548 (S.D. Fla.).

[70] CFPB Exam Manual at UDAAP 9.

[71] See Compl. ¶¶ 34-38 & 43-44, FTC v. Fairbanks Capital Corp., 03-12219 (D. Mass. Nov. 12, 2003) (alleging that the charging of late fees and other associated charges was unfair practice under Section 5 of the FTC Act and a violation of §§ 807 and 808 of the FDCPA), available at http://www.ftc.gov/os/2003/11/0323014comp.pdf.

[72] See, e.g., Compl. ¶¶ 24 & 30-31, FTC v. Cash Today, Ltd., 3:08-cv-590 (D. Nev. Nov. 12, 2008), available at http://www.ftc.gov/os/caselist/0723093/081112cmp0923093.pdf, (asserting that Cash Today engaged in unfair collection practices in violation of Section 5 of the FTC Act by, among other things, disclosing the existence of consumer's debt to employers, co-workers, and other third parties despite being told by consumers not to contact their workplaces); FTC v LoanPointe, LLC., 2:10 CV 00225-DAK, 2011 WL 4348304, at *5 -6 (D. Utah Sept. 16, 2011) (finding that disclosure of existence and amount of debt to consumer's employer without consumer's prior approval constitutes an unfair practice under the FTC Act).

3.    The obligation to avoid UDAAPs under the Dodd-Frank Act *is in addition to any obligations that may arise under the FDCPA*. **Original creditors and other covered persons and service providers involved in collecting debt related to any consumer financial product or service are subject to the prohibition against UDAAPs.**

4.    in the Dodd-Frank Act. The CFPB will continue to review closely the practices of those engaged in the collection of consumer debts for potential UDAAPs, including the practices described above.

## XVI.  CONCLUSION & FINAL THOUGHTS

A.    Plaintiff's Sensitivity & Nose for Consumer Fraud & Abuse

1.    Plaintiff has a keen sensitivity to consumer frauds committed against him, his disabled and elderly mother, other disabled and elderly Americans, and the public at large that hurts Americans, their communities, investors and markets.

2.    Plaintiff admittedly is sensitive to such frauds and abuse and has a well-documented track record in ferreting out consumer fraud and abuse.

3.    Plaintiff has selflessly devoted three-decades to protecting homeowners, borrowers, victims, investors and Americans, including the U.S. government when Fannie Mae, Freddie Mac, HUD, FHA, or the VA may have to pay such fraudulent assessments and claims as part of a related foreclosure action.

4.    Plaintiff and his family have been subject to millions of dollars in numerous harassing lawsuits, break-ins, computer hacks, death threats and other intimidating behavior by lawyers for the foreclosure and HOA bar and their servicer and bank clients.

5. Plaintiff has a unique constitution to look out for others and prevent fraud. In today's computerized and busy world, consumers and investors don't have the time or inclination to devote to examining and auditing bank statements, mortgage statements, utility bills, and credit card purchases and related consumption.

6. This lack of time and resources has allowed companies such as the mortgage servicers and billing and collection companies such as Defendant NES to flourish in programming their practices, processes and systems into predatory, abusive, and fraudulent billing and cash management processes in a programed and engineered way knowing that busy consumers don't have the time to devote to examining such issues.

7. Had Defendant NES sent Plaintiff a bill in the first month of his residency for the approximate $7.00 or dollars possibly owed for water utilities and not for several hundreds of dollars plus late fees for a couple weeks of water usage, Plaintiff would most likely never had bothered examining NES and their fraudulent, deceptive and abusive billing and collection schemes since he too would be too busy to deal with the matter.

8. Had Defendant NES as soon as Plaintiff discovered that he didn't owe the amounts claimed and corrected the bill immediately, perhaps Plaintiff would most likely have ignored the issue and chalked it up to an error, but closly monitored his water bills each month.

9. However, when Plaintiff is sent bill two weeks into his residency via post card as a "collection notice" for several hundred dollars and then Defendant NES for almost two full years refuses to provide any backup or support for such bills and

continues to assess, bill and attempt to collect late and finance fees that they pyramid with their scheme, well Plaintiff had no option than to carefully scrutinize the processes, practices, and systems used by Defendant NES in its alleged "sub-metering" systems and collection practices and audit each bill as he has and taken over 140 hours of his valuable time to document the fraud and abuse.

10.    Had Defendants Kunert Realty, Kunert and Fernando when admitting and realizing that Plaintiff was being charged for the prior tenant's bills plus late fees and other undisclosed charges said to Plaintiff, yes, these NES guys are dirty. Go sick 'em and count us in, instead of violating their agreements with people who paid them over $57,500 over a period of 22 months and then instead attempt to collect an acknowledge dispute and fraudulent debt with threats of eviction with no contractual right whatsoever to pay such unlawful debt to either Defendants Kunert Realty, Kunert, Fernando or ABS USA Int'l, this action would not have escalated to this point.

11.    At no point, did Defendants Kunert Realty, Kunert and Fernando attempt to obtain the information that Plaintiff sought to properly audit the numerous bills. No explanation whatsoever for his questions or support, another red flag for fraud Plaintiff identified in the mortgage servicing scandal.

12.    Had it not been for Plaintiff's expertise, experience and knowledge of the mortgage servicing industry, he may have never caught the problem and perhaps NES has browbeat countless seniors, disabled, and less fortunate Floridians and Americans into submission with their harassing collection techniques.

13.    Plaintiff is aware that his mother and him are not the only victims of the NES scheme and perhaps tons of other Solaire neighbors are victims too as well as other consumers across the state and America, similarly situated.

14.    On information, belief, research, and investigation and likely to have more evidentiary value after document and electronic discovery, Defendant NES' processes, policies, practices, systems, training, and schemes were designed to mimic and follow the mortgage servicing industry and the fraud and abuse is of such a wide-scale under the radar and detection of courts and regulators who are overtaxed, overworked, and understaffed.

15.    This is precisely the reason why U.S. Congress and the Florida legislature created the various state and federal acts cited and complained of herein, to allow consumers such as the Plaintiff, an individual and even a collective right to seek redress for the harm caused to themselves and others.

## XVII.  COUNT I – VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT AS TO DEFENDANT NES

A.    Plaintiff incorporates herein by reference the facts and allegations made in the preceding and foregoing paragraphs as well as those facts stated below.

1.    Defendant NES markets, promotes, advertises and conducts routine and daily debt collection for real estate developers, HOAs and commercial interests and maintains an extensive "collections" department to aggressively collect consumer debts.

2.    From March of 2015 to December of 2016, Defendant NES directly and indirectly made phone calls via robotic means, sent emails as well as postcards and billing statements via U.S. mail to Plaintiff's residence in Orlando, FL as

communication of a debt on behalf of third parties to Plaintiff, a natural person, in Plaintiff's name.

3. The alleged debt claimed to be owed to third persons included water, sewer, meter, and meter service payments for household and personal purposes.

4. As referenced and detailed herein, despite over a year and half of disputes, warnings and threats of lawsuits, as described herein, admittedly Defendant NES assessed, charged, and attempted to collect from Plaintiff on a monthly basis from March of 2015 to November of 2016 non-contracted and fraudulent interest, water and sewer charges, late charges, and expenses that: 1) included hundreds of dollars in utility charges, late charges, finance fees, and other assessments that were the responsibly of other parties, not the Plaintiff, from March of 2014 to late February of 2015 prior to Plaintiff's residence beginning in late February of 2015 in violation of § 808 (1) of the FDCPA and sending postcards of debt in violation of § 808 (7).

5. As referenced and detailed herein, despite over a year and half of disputes, warnings and threats of lawsuits, as described herein, Defendant NES never responded to Plaintiff's disputes and validation of debt nor in any debt collection communication provided a written notice that Plaintiff, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector; a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the

debt collector; and a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor in violation of § 809 (a) (3 – 5) of the FDCPA.

6.    As referenced and detailed herein, despite over a year and half of disputes, warnings and threats of lawsuits, as described herein, Defendant NES:

a.    Sent post cards concerning the alleged debt of Plaintiff in violation of § 808 (7) of the FDCPA.

b.    Communicated with third-parties about the debt that included Defendants Kunert Realty, Kunert, ABS USA International, LLC and Bimal Fernando in violation of § 805 (b) of the FDCPA.

c.    Employed a deceptive, misleading and fraudulent sub-metering and "billing and collection scheme," as described in the paragraphs under the Concise Statement of Facts and Facts & Factual Timeline herein in violation of § 807 (2) (A) & (B); (8), (10) and (11) of the FDCPA.

d.    Employed a deceptive, misleading and fraudulent sub-metering and "billing and collection scheme" as well as "late fee churning and pyramid scheme" assessing, billing and attempting to collect non-contracted or lawful "finance fees," late charges, and certified collection letter fees as described in the paragraphs under the Concise Statement of Facts and Facts & Factual Timeline herein in violation of § 808 (1) of the FDCPA

7.    Each of the thirty-two "$15.00" non-contracted, and deceptive "late charges" billed to both Unit 2208 and 2403 in Plaintiff's name constitute a non-

contracted for late charge, debt obligation and the collection and assessment of both a debt and additional amounts in connection with a debt (including interest, fees, and charges) not expressly authorized by any agreement with Plaintiff creating the debt or permitted by law.

8.  Each of the twenty-two "$2.16" undocumented, non-contracted, and deceptive "finance charges" billed to both Unit 2208 and 2403 in Plaintiff's name constitute a non-contracted for finance charge, debt obligation and the collection and assessment of both a debt and additional amounts in connection with a debt (including interest, fees, and charges) not expressly authorized by any agreement with Plaintiff creating the debt or permitted by law.

9.  Each of the non-contracted and deceptive "collection letter charges" billed to both Unit 2208 and 2403 in Plaintiff's name constitute a non-contracted for charge, debt obligation and the collection and assessment of both a debt and additional amounts in connection with a debt (including interest, fees, and charges) not expressly authorized by any agreement with Plaintiff creating the debt or permitted by law.

10. To understand the alleged utility consumer debt, one must understand the nature of the alleged debt and method of collection of said debt. The Plaintiff's two residences at the Solaire Condominium provides water and alleged "sewer" service to owners and residents such as Plaintiff and Pew.

11. On information and belief, a public utility believed to be Orange County, Florida, provides the Solaire Condominium HOA with water and sewer services for which it bills the Solaire HOA directly.

12. Defendant NES does not provide water or sewer service.

13.    NES' sole function is to provide and/or monitor the water usage of each individual unit in the Solaire Condominium by a sub-meter already in place and/or installed by NES.

14.    Via alleged electronic means, Defendant NES claims to able to monitor the individual water usage of each individual unit in the Solaire Condominium and represents to owners, renters, lessors and occupants that their water utility bills are based on the individual consumption of the unit owner in a sub-metering system

15.    Under a true and actual sub-metering system, the HOA's common areas such as pool, gym, conference rooms and offices should be separately metered to determine the HOA and owner's responsibility for their water or other utility use that would be a common expense of the HOA, not an allocated expense of renters, lessors and occupants who have no obligation for such common expenses that are reserved for the HOA to come from monthly HOA fees.

16.    The Solaire HOA has the ability to raise assessments to owners to cover any increases for common expenses and owners would be presumably able to adjust their monthly rents.

17.    Public utilities such as Orange County, have established and negotiated set per 1000 gallon rates for water usage and a some corresponding sewer fee related to the actual use of water.

18.    As such, a true sub-metering system would use the identical per gallon or per 1000 gallon water rate that the utility was billing the HOA each month. Thus, unless the water utility adjusted or raised the per gallon or per 1000 gallon rate, the amount paid each month for water usage would be constant and not variable.

19.     Furthermore, the "monthly" rate for per gallon or per 1000 gallon rate water usage should be identical from unit to unit. In essence, if unit 2403 is paying $2.00 or $4.00 per 1000 gallons for the month of July in 2016, unit 2208 or any other unit in the building would by paying the same identical rate of 2.00 or $4.00 per 1000 gallons, or whatever the proper "division" of the actual amount paid to the utility is.

20.     Furthermore, the monthly rate for per gallon or per 1000 gallon rate water usage would be identical month-to-month, unless the public utility increased their rates. Thus, if unit 2403 or unit 2208 had a $2.00 per 1000 gallon water rate for July of 2016, then August 2016 should also have a $2.00 per 1000 gallon water rate or if an increase were made, some form of "nominal" increase.

21.     The NES bills had a constant $0.88 per 1000 gallon rate for sewer usage and water usage should have been set accordingly.

22.     However, variances were not only wildly different from month-to-month billing by as much as almost a 100% increase, but also from unit-to-unit billing in the same month by more than 80%.

23.     Any variance, especially variances as high as those referenced is indicative of either a RUBS and not sum-metered system or the allocation of common and/or other HOA expenses being added to the utility bills to cover HOA budget shortfalls via the utility billing with kickbacks to the HOA by NES.

24.     Even if a RUBS system, the remaining water usage that was allocated to the actual units, would then go into an allocated pot that would then divide the remaining units and monthly unit-to-unit billing would be the same with no variance.

25.     The evidence and facts presented herein, reflect that an undisclosed, concealed and some form of formulaic equation and/or metering measures were created by Defendant NES that NES failed to provide to the Plaintiff in order to confirm his suspicions of fraud.

26.     Since Plaintiff is being "sub-metered," and billed, he or any customer of Defendant NES should be lawfully and/or contractually entitled to know:

a.      How the "sub-metering" system works and how water is billed to any customer of NES;

b.      How much in water and sewer charges were billed to the HOA on any given month by the bill submitted to the HOA by the public utility and paid by the HOA;

c.      How the amount billed to the HOA on any given month by the bill submitted to the HOA by the public utility was divided, allocated and attributable to the Plaintiff or any other owner, lessor, renter, or occupant's sub-metered water usage;

d.      The excel spreadsheet, computer program or other calculation of how the actual alleged allocations, usage, and metering occurred.

27.     Minor fluctuations and variations for month-to-month same unit rates or unit-to-unit same month usage and rates are a red flag for abuse and fraud. However, 80% to 100% variances in month-to-moth and unit-to-unit utility charges is not only a red flag of fraud, but evidence of fraud.

28.     In addition to the stated and billed "water usage" and "sewer charges," that are alleged and disputed "utility charges," NES assesses, bills and collects on non-contracted, undisclosed, and unknown "finance fees," "late charges," and

"collection letter" fees.

WHEREFORE, Plaintiff demands that a judgment for damages in his favor and against Defendant NES, for his actual or statutory damages, whichever is greater; for punitive damages if allowable by law; for his attorney's fees and costs, and for any other relief the Court deems proper and just.

## XVIII. COUNT II - - VIOLATION OF FLORIDA'S CONSUMER COLLECTION PRACTICES ACT AS TO NES & KUNERT REALTY

A.    Plaintiff incorporates herein by reference the facts and allegations made in the preceding and foregoing paragraphs, each prior Count as well as those facts stated below:

1.    Specifically, Plaintiff incorporates herein by reference the facts and allegations made in Count I for violations of the Federal Fair Debt Collection Practices Act ("FDCPA") and that Defendant NES has violated Florida Statue 559.72 (3), (5), (6), (7), (9), (15) and (19) by the acts described.

2.    Plaintiff is a consumer and the alleged utility debt obligation being collected by Defendant NES from Plaintiff is a consumer debt as defined in section 559.55(6), Florida Statutes.

3.    "Consumer collection agency" means any debt collector *or business entity engaged in the business of soliciting consumer debts for collection or of collecting consumer debts, which debt collector or business is not expressly exempted as set forth in s. 559.553(4).*

4.    Defendant NES is a debt collector and in the business of collecting consumer debts as defined by 559.55 (6) and is not exempted by s. 559.553(4).

5.      A search of the Florida Office of Financial Regulation for Defendant NES at
        https://real.flofr.com/consumerservices/searchlicensingrecords/search.aspx
        reflects that Defendant NES, an acknowledged "Consumer Collection Agency"
        as defined herein, is not registered as a Consumer Collection Agency and is in
        violation of Florida Statute 559.555.

6.      NES, acting through its employees, agents and/or assigns, has engaged in
        consumer collection conduct which amounts to a violations of section 559.72
        (3), (5), (6), (7), (9), (15) and (19) Florida Statutes as set out herein.

7.      These acts were wrongful and predatory acts by NES, and were intentional and
        deceptive.

8.      Defendant NES markets, promotes, advertises and conducts routine and daily
        debt collection for real estate developers, HOAs and commercial interests and
        maintains an extensive "collections" department to aggressively collect
        consumer debts.

9.      From March of 2015 to December of 2016, Defendant NES directly and
        indirectly made phone calls via robotic means, sent emails as well as postcards
        and billing statements via U.S. mail to Plaintiff's residence in Orlando, FL as
        communication of a debt on behalf of third parties to Plaintiff, a natural person,
        in Plaintiff's name.

10.     The alleged debt claimed to be owed to third persons included water, sewer,
        meter, and meter service payments for household and personal purposes.

11.     As referenced and detailed herein, despite over a year and half of disputes,
        warnings and threats of lawsuits, as described herein, admittedly Defendant
        NES assessed, charged, and attempted to collect from Plaintiff on a monthly

basis from March of 2015 to November of 2016 non-contracted and fraudulent

interest, water and sewer charges, late charges, and expenses that: 1) included

hundreds of dollars in utility charges, late charges, finance fees, and other

assessments that were the responsibly of other parties, not the Plaintiff, from

March of 2014 to late February of 2015 prior to Plaintiff's residence beginning

in late February of 2015 in violation of § 808 (1) of the FDCPA and sending

postcards of debt in violation of § 808 (7).

12.   As referenced and detailed herein, despite over a year and half of disputes,

warnings and threats of lawsuits, as described herein, Defendant NES never

responded to Plaintiff's disputes and validation of debt nor in any debt

collection communication provided a written notice that Plaintiff, within thirty

days after receipt of the notice, disputes the validity of the debt, or any portion

thereof, the debt will be assumed to be valid by the debt collector; a statement

that if the consumer notifies the debt collector in writing within the thirty-day

period that the debt, or any portion thereof, is disputed, the debt collector will

obtain verification of the debt or a copy of a judgment against the consumer and

a copy of such verification or judgment will be mailed to the consumer by the

debt collector; and a statement that, upon the consumer's written request within

the thirty-day period, the debt collector will provide the consumer with the

name and address of the original creditor, if different from the current creditor

in violation of § 809 (a) (3 – 5) of the FDCPA.

13.   As referenced and detailed herein, despite over a year and half of disputes,

warnings and threats of lawsuits, as described herein, Defendant NES:

a.   Sent post cards concerning the alleged debt of Plaintiff in violation of §

808 (7) of the FDCPA.

b.    Communicated with third-parties about the debt that included

Defendants Kunert Realty, Kunert, ABS USA International, LLC and

Bimal Fernando in violation of § 805 (b) of the FDCPA.

c.    Employed a deceptive, misleading and fraudulent sub-metering and

"billing and collection scheme," as described in the paragraphs under the

Concise Statement of Facts and Facts & Factual Timeline herein in

violation of § 807 (2) (A) & (B); (8), (10) and (11) of the FDCPA.

d.    Employed a deceptive, misleading and fraudulent sub-metering and

"billing and collection scheme" as well as "late fee churning and

pyramid scheme" assessing, billing and attempting to collect non-

contracted or lawful "finance fees," late charges, and certified collection

letter fees as described in the paragraphs under the Concise Statement of

Facts and Facts & Factual Timeline herein in violation of § 808 (1) of

the FDCPA

14.    Each of the thirty-two "$15.00" non-contracted, and deceptive "late charges"

billed to both Unit 2208 and 2403 in Plaintiff's name constitute a non-

contracted for late charge, debt obligation and the collection and assessment of

both a debt and additional amounts in connection with a debt (including interest,

fees, and charges) not expressly authorized by any agreement with Plaintiff

creating the debt or permitted by law.

15.    Each of the twenty-two "$2.16" undocumented, non-contracted, and deceptive

"finance charges" billed to both Unit 2208 and 2403 in Plaintiff's name

constitute a non-contracted for finance charge, debt obligation and the collection

and assessment of both a debt and additional amounts in connection with a debt (including interest, fees, and charges) not expressly authorized by any agreement with Plaintiff creating the debt or permitted by law.

16.     Each of the non-contracted and deceptive "collection letter charges" billed to both Unit 2208 and 2403 in Plaintiff's name constitute a non-contracted for charge, debt obligation and the collection and assessment of both a debt and additional amounts in connection with a debt (including interest, fees, and charges) not expressly authorized by any agreement with Plaintiff creating the debt or permitted by law.

17.     To understand the alleged utility consumer debt, one must understand the nature of the alleged debt and method of collection of said debt. The Plaintiff's two residences at the Solaire Condominium provides water and alleged "sewer" service to owners and residents such as Plaintiff and Pew.

18.     On information and belief, a public utility believed to be Orange County, Florida, provides the Solaire Condominium HOA with water and sewer services for which it bills the Solaire HOA directly.

19.     Defendant NES does not provide water or sewer service.

20.     NES' sole function is to provide and/or monitor the water usage of each individual unit in the Solaire Condominium by a sub-meter already in place and/or installed by NES.

21.     Via alleged electronic means, Defendant NES claims to able to monitor the individual water usage of each individual unit in the Solaire Condominium and represents to owners, renters, lessors and occupants that their water utility bills are based on the individual consumption of the unit owner in a sub-metering

system

22. Under a true and actual sub-metering system, the HOA's common areas such as pool, gym, conference rooms and offices should be separately metered to determine the HOA and owner's responsibility for their water or other utility use that would be a common expense of the HOA, not an allocated expense of renters, lessors and occupants who have no obligation for such common expenses that are reserved for the HOA to come from monthly HOA fees.

23. The Solaire HOA has the ability to raise assessments to owners to cover any increases for common expenses and owners would be presumably able to adjust their monthly rents.

24. Public utilities such as Orange County, have established and negotiated set per 1000 gallon rates for water usage and a some corresponding sewer fee related to the actual use of water.

25. As such, a true sub-metering system would use the identical per gallon or per 1000 gallon water rate that the utility was billing the HOA each month. Thus, unless the water utility adjusted or raised the per gallon or per 1000 gallon rate, the amount paid each month for water usage would be constant and not variable.

26. Furthermore, the "monthly" rate for per gallon or per 1000 gallon rate water usage should be identical from unit to unit. In essence, if unit 2403 is paying $2.00 or $4.00 per 1000 gallons for the month of July in 2016, unit 2208 or any other unit in the building would by paying the same identical rate of 2.00 or $4.00 per 1000 gallons, or whatever the proper "division" of the actual amount paid to the utility is.

27. Furthermore, the monthly rate for per gallon or per 1000 gallon rate water usage

would be identical month-to-month, unless the public utility increased their rates. Thus, if unit 2403 or unit 2208 had a $2.00 per 1000 gallon water rate for July of 2016, then August 2016 should also have a $2.00 per 1000 gallon water rate or if an increase were made, some form of "nominal" increase.

28.    The NES bills had a constant $0.88 per 1000 gallon rate for sewer usage and water usage should have been set accordingly.

29.    However, variances were not only wildly different from month-to-month billing by as much as almost a 100% increase, but also from unit-to-unit billing in the same month by more than 80%.

30.    Any variance, especially variances as high as those referenced is indicative of either a RUBS and not sum-metered system or the allocation of common and/or other HOA expenses being added to the utility bills to cover HOA budget shortfalls via the utility billing with kickbacks to the HOA by NES.

31.    Even if a RUBS system, the remaining water usage that was allocated to the actual units, would then go into an allocated pot that would then divide the remaining units and monthly unit-to-unit billing would be the same with no variance.

32.    The evidence and facts presented herein, reflect that an undisclosed, concealed and some form of formulaic equation and/or metering measures were created by Defendant NES that NES failed to provide to the Plaintiff in order to confirm his suspicions of fraud.

33.    Since Plaintiff is being "sub-metered," and billed, he or any customer of Defendant NES should be lawfully and/or contractually entitled to know:

    a.    How the "sub-metering" system works and how water is billed to any

customer of NES;

b.     How much in water and sewer charges were billed to the HOA on any given month by the bill submitted to the HOA by the public utility and paid by the HOA;

c.     How the amount billed to the HOA on any given month by the bill submitted to the HOA by the public utility was divided, allocated and attributable to the Plaintiff or any other owner, lessor, renter, or occupant's sub-metered water usage;

d.     The excel spreadsheet, computer program or other calculation of how the actual alleged allocations, usage, and metering occurred.

34.    Minor fluctuations and variations for month-to-month same unit rates or unit-to-unit same month usage and rates are a red flag for abuse and fraud. However, 80% to 100% variances in month-to-moth and unit-to-unit utility charges is not only a red flag of fraud, but evidence of fraud.

35.    In addition to the stated and billed "water usage" and "sewer charges," that are alleged and disputed "utility charges," NES assesses, bills and collects on non-contracted, undisclosed, and unknown "finance fees," "late charges," and "collection letter" fees.

36.    325. Defendant Kunert Realty is in the business of leasing, renting, and managing real estate for investors and routinely invoicing, billing, collecting and even evicting tenants from property for the alleged property owners it represents as alleged agent and collection agent.

37.    Defendant Kunert Realty represents third party "foreign investors" in American real estate and property and represents them as their leasing, sales and

"collection agent" and bills and demands payments on a regular and monthly basis from consumer such as Plaintiff and Pew.

38.     Defendants Kunert Realty and Kunert have demanded that Plaintiff pay Kunert Realty the unlawful, non-contracted, non-obligated and fraudulent debt alleged to be owed by Plaintiff to NES.

39.     It is unknown if Defendant Kunert Realty and Kunert purchased or was assigned the unlawful, non-contracted, non-obligated and fraudulent debt alleged to be owed by Plaintiff to NES.

40.     Defendant Kunert Realty on a monthly basis collects rents, utilities, fines, and other "consumer debts" as defined by Section 559.55 (6) is a business entity engaged in the business of collecting consumer debts, which debt collector or business is not expressly exempted as set forth in s. 559.553(3).

41.     On a regular and continual basis, Defendant Kunert Realty also threatens, manages and guides legal eviction actions if collection demands are not paid.

42.     Thus, Defendant Kunert Realty *is a **business entity** engaged in the business of soliciting consumer debts for collection or of collecting consumer debts, which debt collector or business is not expressly exempted as set forth in s. 559.553(4).*

43.     As described herein, Defendant Kunert Realty made numerous collection attempts of an unpaid and disputed water utility bill upon the Plaintiff by emails, phone calls and threats of eviction lawsuits and demanded that such payment be made to Kunert Realty or Defendant Fernando, neither of which had any contract for a debt obligation with Plaintiff that allowed for such collection nor did Plaintiff have any legal or debt obligation for water bills with either

party.

44.     As a proximate result thereof, Plaintiff has sustained economic damages for which he is entitled to compensation from Defendants NES, Kunert Realty and Kunert, pursuant to section 559.77, Florida Statutes.

WHEREFORE, Plaintiff demands that a judgment for damages in his favor and against Defendant NES, Kunert, and Kunert Realty for his actual or statutory damages, whichever is greater; for punitive damages if allowable by law; for his attorney's fees and costs, and for any other relief the Court deems proper and just.

## XIX.   COUNT III. - - VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT ("TCPA") 47 U.S.C. § 227 AS TO DEFENDANT NES

A.     Plaintiff incorporates herein by reference the facts and allegations made in the preceding and foregoing paragraphs, each prior Count as well as those facts stated below:

1.     Based upon preliminary investigation, research, information and belief and likely to have more evidentiary value after discovery and a review of Defendant NES' call logs and phone bills, Defendant NES placed dozens of phone calls via robotic means to Plaintiff on his cell phone in order to collect unlawful and non-contracted debts.

2.     Each call documented in NES' or Plaintiff's phone records made by robotic means to Plaintiff's private cell phone number constitutes a violation of the TCPA.

WHEREFORE, Plaintiff demands that a judgment for damages in his favor and against Defendant NES, for his actual or statutory damages, whichever is greater; for punitive damages if allowable by law; for his attorney's fees and costs, and for any other relief the Court deems proper and just.

XX.    **COUNT IV. - - DECLARATORY JUDGMENT AS TO ANY AGREEMENTS WITH DEFENDANTS FERNANDO, ABS, & NES**

A.    Plaintiff incorporates herein by reference the facts and allegations made in the preceding and foregoing paragraphs, each prior Count as well as those facts stated below:

   1.    A present controversy exists between Plaintiff and Defendants Fernando and ABS USA, Int'l. as to whether Plaintiff executed any agreement or contract with Defendants Fernando or ABS USA, Int'l. that requires Plaintiff to pay any utility bills whatsoever, let alone a disputed, unlawful, and fraudulent bill issued by Defendant NES to Plaintiff and paid by Defendant ABS USA Int'l.

   2.    A present controversy exists between Plaintiff and Defendants Fernando and ABS USA, Int'l. as to whether Plaintiff executed any agreement or contract with Defendants Fernando or Kunert Realty that allows Fernando and Kunert Realty to provide Plaintiff and Pew any notice, let alone a 30-day notice to vacate and not renew due to:

      a.    Any contractual terms or provisions with Fernando;

      b.    Non-payment of any utility bills whatsoever, let alone a disputed, unlawful, and fraudulent bill issued by Defendant NES to Plaintiff and paid by Defendant ABS USA Int'l.

   3.    A present controversy exists between Plaintiff and Defendants Fernando and ABS USA, Int'l. as to whether Defendants Fernando and/or ABS USA, Int'l. or another entity or person actually owns Unit 2208 and 2403 that Plaintiff occupies.

   4.    A present controversy exists between Plaintiff and Defendants Fernando and

ABS USA, Int'l. as to whether Defendants Fernando and ABS USA, Int'l. had any right to demand any payment from Plaintiff per any agreement or contract.

5.   A present controversy exists between Plaintiff and Defendants Kunert and Kunert Realty as to the security and use of the security deposit payment from Plaintiff.

6.   A present controversy exists between Plaintiff and Defendants Kunert, Kunert Realty and Fernando as to options for purchase and mortgage financing agreements reached between the parties.

7.   A present controversy exists between Plaintiff and Defendants Kunert, Kunert Realty and Fernando as to whether Fernando had any right or authority to negotiate a new agreement with Plaintiff and modify any prior agreements reached.

8.   A present controversy exists between Plaintiff and Defendant NES whether Plaintiff had any contract or agreement with Defendant NES.

9.   A present controversy exists between Plaintiff and Defendant NES whether Plaintiff had any contract or agreement with Defendant NES that allowed NES to assess, bill and collect:

    a.   Any or each of the $2.16 "finance charges" billed and paid for by Defendant ABS USA, Int'l on Plaintiff's accounts.

    b.   Any or each of the $15.00 "late fee charges" billed and paid for by Defendant ABS USA, Int'l on Plaintiff's accounts.

    c.   Any or each of the Misc. "letter fee charges" billed and paid for by Defendant ABS USA, Int'l on Plaintiff's accounts.

d.    Any or each of the "Sewer and Water Charges" billed and paid for by Defendant ABS USA, Int'l on Plaintiff's accounts.

e.    Any amounts for water usage charges not directly attributable to Plaintiff and Pew's occupancy of Units 2403 and 2208.

WHEREFORE Plaintiff requests this Court to grant this petition and enter a declaratory judgment as to whether any contract exists between Plaintiff and NES and whether the charges listed above were contractually allowable to be assessed, bill and collected from Plaintiff; the terms and conditions of any agreements between Plaintiff, Fernando, Kunert Realty, and ABS USA, Int'l. as discussed above and whatever other declaration or relief that the Court  may deem to be proper and just.

## XXI.    COUNT V. - - VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT AS TO DEFENDANTS NES, KUNERT REALTY, KUNERT & FERNANDO

A.    Plaintiff incorporates herein by reference the facts and allegations made in the preceding and foregoing paragraphs, each prior Count as well as those facts stated below:

1.    This is an action for injunctive and declaratory relief and for damages pursuant to the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §501.201, et seq. (hereinafter "the FDUTPA") against Defendants NES, Kunert Realty, Kunert and Fernando.

2.    At all times relevant hereto, Plaintiff was a consumer as defined by section 501.203 (7), Florida Statutes.

3.    At all times relevant hereto, Defendants NES, Kunert Realty, and Fernando were engaged in "trade or commerce" as defined by Florida Statutes§ 501.203 (8).

4.   Specifically, Plaintiff incorporates herein by reference the facts and allegations made in Count I for violations of the Federal Fair Debt Collection Practices Act ("FDCPA") and that Defendant NES has violated Florida Statue 559.72 (3), (5), (6), (7), (9), (15) and (19) by the acts described as well as each of the acts described in Counts I and II above are violations of 501.204 (1) in that the acts described herein are unconscionable acts and practices and well as unfair and deceptive acts and practices in the conduct of trade and commerce.

5.   Moreover, the misrepresentation, mischaracterization, and imposition, billing and collection of unexplained, non-contracted, "fixed" and usurious "finance fees" of $2.16 per month that sometimes equals 40% of the alleged water and sewer bill are unconscionable, unfair, and deceptive acts and practices.

6.   Moreover, the imposition, billing, and collection of unexplained, non-contracted fees for sending unlawful "collection letters" on top of the imposition, billing, and collection of unlawful and non-contracted "late fees" to collect a knowingly non-obligated and fraudulent debt are unconscionable, unfair, and deceptive acts and practices.

7.   Moreover, the imposition, billing, and collection of non-contracted late fees for sending Plaintiff collection notices and bills obligated to by another party and not correcting and adjusting said bills on a timely basis after dispute and falsely and fraudulently entering into and programing the billing computer system to falsely make Plaintiff a tenant and responsible for Unit 2403's bills since March 24, 2014, almost a year before Plaintiff stepped in the Unit, let alone took possession of the unit are unconscionable, unfair, and deceptive acts and practices.

8.      NES by its agents and/or assigns and/or its lawful representatives, have violated the Act by engaging in unfair and deceptive acts and practices including, but not limited to fraudulently and deceptively submetering and creating false bills and statements with unlawful and/or non-contracted for water and sewer, finance fee, collection letter fees, and finance fee assessments, charges, and then setting for harassing and aggressive collection efforts for Plaintiff's alleged debt related to water utility bills for Units 2208 and 2403 and specifically to:

a.      Each $15.00 late fee and charged, assessed, billed and/or collected;

b.      Each $2.16 "finance fee" charged, assessed, billed and/or collected;

c.      Each varying misc. fee for collection letter fee charged, assessed, billed and/or collected;

d.      Each varying charge for water charged, assessed, billed and/or collected;

e.      Each varying charge for sewer usage charged, assessed, billed and/or collected.

9.      Moreover, the misrepresentation, mischaracterization, and imposition, billing and collection of unexplained, non-contracted, "fixed" and usurious "finance fees" of $2.16 per month that sometimes equals 40% of the alleged water and sewer bill are unconscionable, unfair, and deceptive acts and practices.

10.     NES by its agents and/or assigns and/or its lawful representatives, have violated the Act by engaging in unfair and deceptive acts and practices including, but not limited to fraudulently and deceptively submetering and creating false bills and statements for:

a.      Each subsequent cumulative bill, statement and collection notice

directed or sent to Plaintiff for Unit 2403 to Plaintiff from March of 2015 to December of 2016 that included any charge as listed herein and above from March of 2014 to February 18 of 2015.

b.    Each bill, statement and collection notice directed or sent to Plaintiff for Units 2403 and 2208 from March of 2015 to December of 2016 that contained a non-contracted for:

- $2.16 "finance fee;"

- $15.00 "late fee;"

- A misc. credit collection letter fee.

c.    Each bill, statement and collection notice directed or sent to Plaintiff for Units 2403 and 2208 from March of 2015 to December of 2016 that contained a water charge and sewer charge that:

- Was marked up more than the actual rate charged by the local Orlando water utility providing servicing and billing the Solaire at the Plaza HOA;

- Allocated or apportioned more than the actual use of water and sewer charges for Units 2403 and 2208.

11.    Defendants Kunert, Kunert Realty, Fernando, and ABS USA, Int'l. violated the Act when they paid the fraudulently created NES debt as described herein and took collection actions seeking payment of the unlawful, fraudulent, and non-contracted NES debt in amounts greater than allowed by law and for which Plaintiff had no duty, obligation or legal responsibility for.

12.    Defendants Kunert, Kunert Realty, Fernando, and ABS USA, Int'l. the Act

when they threatened to evict Plaintiff and Pew for refusing to pay the unlawful, fraudulent, and non-contracted NES debt in amounts greater than allowed by law and for which Plaintiff had no duty, obligation or legal responsibility for.

13.   As a result of the violations of Florida's Unfair and Deceptive Trade Practices Act, Plaintiff has been damaged and seeks to recover his actual and statutory damages, attorney's fees and costs under Florida Statutes §501.211 and 501.2105.

14.   As a result of the violations of Florida's Unfair and Deceptive Trade Practices Act, Plaintiff has been damaged and seeks an injunction as to Defendant's Kunert, Kunert Realty, Fernando and ABS USA, Int'l. to:

    a.   Keep the current status quo as to the living arrangements for Plaintiff and Pew with the monthly previously agreed upon compensation paid into the registry of the Court;

    b.   Cease all collection efforts and threats of eviction;

    c.   Take any legal action for eviction against Plaintiff or Pew.

15.   As a result of the violations of Florida's Unfair and Deceptive Trade Practices Act, Plaintiff has been damaged and seeks an injunction as to NES to cease all billing and collections of the non-contracted for $2.16 finance charges, $15.00 late fees, misc. collect letter fees, and each amount for water and/or sewer use that:

    a.   Marks up the amounts actually paid by the subject HOA;

    b.   Allocates or apportions more of the amounts actually paid by the subject HOA that exceed Plaintiff's actual water usage for Units 2403 and 2208.

WHEREFORE, Plaintiff demands that a judgment for damages in his favor and against Defendant Fernando, NES, Kunert, and Kunert Realty for his actual or statutory damages, whichever is greater; for punitive damages if allowable by law; injunctive relief; for his attorney's fees and costs, and for any other relief the Court deems proper and just.

## XXII.  COUNT VI. - - FRAUD IN THE INDUCEMENT AS TO DEFENDANTS KUNERT REALTY, KUNERT & FERNANDO

A.  Plaintiff incorporates herein by reference the facts and allegations made in the preceding and foregoing paragraphs, each prior Count as well as those facts stated below:

1.  Defendants Kunert and Kurnert Realty intentionally misrepresented material facts to the Plaintiff that Plaintiff relied upon to his damage in terms of:

a.  The ownership of Units 2403 and 2208;

b.  Their ability to enter into an occupancy, lease and purchase option agreement with Plaintiff on behalf of the true owner of Units 2403 and 2208;

c.  Agreeing to an automatic annual renewal for occupancy of 2403 and 2208;

d.  Agreeing to a mutual three-month notice requirement of any changes;

e.  Agreement for first option of refusal for purchase of Units 2403 and 2208;

f.  Concealing the true owner of Units 2403 and 2208.

2.  Defendants Kunert and Kurnert Realty intended Plaintiff to rely on the following false statements and representations to induce Plaintiff to rely and act

on them to Plaintiff's detriment:

    a.      The ownership of Units 2403 and 2208;

    b.      Their ability to enter into an occupancy, lease and purchase option agreement with Plaintiff on behalf of the true owner of Units 2403 and 2208;

    c.      Agreeing to an automatic annual renewal for occupancy of 2403 and 2208;

    d.      Agreeing to a mutual three-month notice requirement of any changes;

    e.      Agreement for first option of refusal for purchase of Units 2403 and 2208;

3.    Plaintiff relied upon the material misrepresentations of Defendants Kunert and Kurnert Realty to the detriment and damage of Plaintiff in terms of:

    a.      Plaintiff would not gone to the expenditures of moving Pew and himself into Units 2403 and 2208 without the agreements reached with Defendant Kunert & Kunert Realty as described herein.

    b.      Plaintiff would not gone to the expenditures of spending several thousand dollars to upgrade Unit 2403 with new carpet, paint, light fixtures, plumbing fixtures, and window dressings without the agreements reached with Defendant Kunert & Kunert Realty as described herein;

    c.      Plaintiff would have not made many of the personal, business and living decisions and sacrifices that he made;

    d.      Plaintiff would not have moved Pew and himself into Units 2403 and

2208 without the agreements reached with Defendant Kunert & Kunert Realty as described herein.

4.  Defendant Fenando intentionally misrepresented material facts to the Plaintiff that Plaintiff relied upon to his damage in terms of:

   a.  His "personal" ownership of Units 2403 and 2208;

   b.  His ability to enter into a modification and extension of the prior occupancy, lease and purchase option agreements reached with Plaintiff for Units 2403 and 2208 by Defendants Kunert and Kunert Realty;

   c.  Agreeing to an automatic annual renewal for occupancy of 2403 and 2208;

   d.  Agreeing to a mutual three-month notice requirement of any changes to Unit 2208 and agreement for Plaintiff to pay three-month's rent if Pew's health decline and living independence was no longer possible or her death;

   e.  Agreeing to enter into a mortgage-finance arrangement with Plaintiff for Units 2403 and 2208 if the HOA changed its rules.

5.  Defendant Fernando intended Plaintiff to rely on the following false statements and representations to induce Plaintiff to rely and act on them to Plaintiff's detriment:

   a.  His "personal" ownership of Units 2403 and 2208;

   b.  His ability to enter into a modification and extension of the prior occupancy, lease and purchase option agreements reached with Plaintiff for Units 2403 and 2208 by Defendants Kunert and Kunert Realty;

c.   Agreeing to an automatic annual renewal for occupancy of 2403 and 2208;

d.   Agreeing to a mutual three-month notice requirement of any changes to Unit 2208 and agreement for Plaintiff to pay three-month's rent if Pew's health decline and living independence was no longer possible or her death;

e.   Agreeing to enter into a mortgage-finance arrangement with Plaintiff for Units 2403 and 2208 if the HOA changed its rules.

6.   Plaintiff relied upon the material misrepresentations of Defendant Fernando to the detriment and damage of Plaintiff in terms of:

a.   Plaintiff would not have modified and extended the prior existing agreement;

b.   Plaintiff would have filed a declaratory action and suit a year earlier to enforce the prior agreements reached;

c.   Plaintiff would have not made many of the personal, business and living decisions and sacrifices that he made over the last year.

WHEREFORE, Plaintiff demands that a judgment for damages in his favor and against Defendant Fernando, Kunert, and Kunert Realty for his actual or statutory damages, whichever is greater; for punitive damages if allowable by law; for his attorney's fees and costs, and for any other relief the Court deems proper and just.

## XXIII. COUNT VII. - - BREACH OF CONTRACT AS TO DEFENDANTS KUNERT
## REALTY, KUNERT & FERNANDO

A.    Plaintiff incorporates herein by reference the facts and allegations made in the
preceding and foregoing paragraphs, each prior Count as well as those facts stated
below:

1.    In February of 2015, Plaintiff entered into an agreement to an annual renewable
lease for the occupancy of Units 2403 and 2208 as described herein.

2.    The agreement first reached with Defendants Kunert and Kunert Realty called
for an annually renewable occupancy and lease agreement for Units 2403 and
2208's lawful owner with an option of first refusal to purchase upon any
decision of the unit's lawful owner to sell or forced to sell due to any HOA
permit change.

3.    Due to Pew's health, the agreement first reached with Defendants Kunert and
Kunert Realty also called for any notices to invoke the purchase to provide 3-
month's notice.

4.    The modification agreement reached with Defendant Fernando called for an
annually renewable occupancy and lease agreement for Units 2403 and 2208's
lawful owner with an option to finance the purchase of each unit from its lawful
owner if forced to sell due to any HOA permit change and called for any notices
by any party to be 3-months due to Pew's health and an extension of a year to
the current agreement.

5.    There was no agreement for Plaintiff to pay or assume the water bills of the
prior unit's occupant or to pay unlawful charges and fees.

6.    Despite the agreements and assurances of Defendants Kunert, Kunert Realty

and Fernando, they breached their agreements with Plaintiff as set forth herein.

WHEREFORE, Plaintiff demands that a judgment for damages in his favor and against Defendant

Fernando, Kunert, and Kunert Realty for his actual or statutory damages, whichever is greater; for

punitive damages if allowable by law; for his attorney's fees and costs, and for any other relief the

Court deems proper and just.

## XXIV. COUNT VIII. - - PROMISSORY FRAUD AS TO DEFENDANTS KUNERT REALTY, KUNERT & FERNANDO

A.     Plaintiff incorporates herein by reference the facts and allegations made in the

preceding and foregoing paragraphs, each prior Count as well as those facts stated

below:

1.     As described herein, Defendants Kunert, Kunert Realty and Fernando

intentionally made false promises to Plaintiff in order to secure Plaintiff's

occupancy, payment and investment in upgrading Unit 2403 regarding:

a.     The true ownership of Units 2403 and 2208;

b.     Fernando's ability to enter into a modification and extension of the prior

occupancy, lease and purchase option agreements reached with Plaintiff

for Units 2403 and 2208 by Defendants Kunert and Kunert Realty;

c.     Agreeing to an automatic annual renewal for occupancy of 2403 and

2208;

d.     Agreeing to a mutual three-month notice requirement of any changes to

Unit 2208 and agreement for Plaintiff to pay three-month's rent if Pew's

health decline and living independence was no longer possible or her

death;

    e.      Agreeing to enter into a mortgage-finance arrangement with Plaintiff for Units 2403 and 2208 if the HOA changed its rules;

    f.      Agreeing for the option of first refusal in the First Agreement for purchase.

2.      The promises of Defendants Kunert, Kunert Realty and Fernando cost several thousand dollars in investment; $55,750 in payments; foregoing options to purchase and sell other real estate; foregoing other investment opportunities and other personal living, business, and personal decisions.

3.      Defendants Kunert, Kunert Realty and Fernando had no intention of honoring the agreements reached with Plaintiff and even concealed the real party in interest and owner of each Unit, ABS.

WHEREFORE, Plaintiff demands that a judgment for damages in his favor and against Defendant Fernando, Kunert, and Kunert Realty for his actual or statutory damages, whichever is greater; for punitive damages if allowable by law; for his attorney's fees and costs, and for any other relief the Court deems proper and just.

## XXV.  COUNT IX. - - FRAUDULENT MISREPRESENTATION AS TO DEFENDANTS KUNERT, KUNERT REALTY, FERNANDO & NES

A.      Plaintiff incorporates herein by reference the facts and allegations made in the preceding and foregoing paragraphs, each prior Count as well as those facts stated below:

1.      As described herein, Defendants Kunert, Kunert Realty and Fernando intentionally made false statements and promises to Plaintiff regarding:

    a.      The true ownership of Units 2403 and 2208;

b.     Fernando's ability to enter into a modification and extension of the prior occupancy, lease and purchase option agreements reached with Plaintiff for Units 2403 and 2208 by Defendants Kunert and Kunert Realty;

c.     Agreeing to an automatic annual renewal for occupancy of 2403 and 2208;

d.     Agreeing to a mutual three-month notice requirement of any changes to Unit 2208 and agreement for Plaintiff to pay three-month's rent if Pew's health decline and living independence was no longer possible or her death;

e.     Agreeing to enter into a mortgage-finance arrangement with Plaintiff for Units 2403 and 2208 if the HOA changed its rules;

f.     Agreeing for the option of first refusal in the First Agreement for purchase.

2.     As described herein, Defendants Kunert, Kunert Realty and Fernando knew the intentionally false statements as described herein were false when Kunert, Kunert Realty and Fernando made the false statements knowing that Plaintiff was without knowledge of their falsity.

3.     As described herein, Defendants Kunert, Kunert Realty and Fernando in making their intentionally false statements intended that Plaintiff and Pew would rely on their false statements.

4.     Plaintiff and Pew relied on Kunert, Kunert Realty and Fernando's false statements in making appropriate business, personal, living, expenditure and investment decisions.

5.    Plaintiff suffered losses and damages as a result of Kunert, Kunert Realty and Fernando's false statements as stated herein.

6.    As described herein, Defendant NES intentionally made false statements to Plaintiff regarding the amount of Plaintiff's alleged debt obligation related to water utility bills for Units 2208 and 2403 and specifically to:

   a.    Plaintiff's personal obligation for water utility bills for Unit 2403 from March of 2014 to February 18, 2015 when Plaintiff occupied the unit including, but not limited to:

   - Each $15.00 late fee and charged, assessed, billed and/or collected;

   - Each $2.16 "finance fee" charged, assessed, billed and/or collected;

   - Each varying misc fee for collection letter fee charged, assessed, billed and/or collected;

   - Each varying charge for water charged, assessed, billed and/or collected;

   - Each varying charge for sewer usage charged, assessed, billed and/or collected.

7.    As described herein, Defendant NES intentionally made false statements to Plaintiff regarding the amount of Plaintiff's alleged debt obligation related to water utility bills for Units 2208 and 2403 and specifically to:

   a.    Each subsequent cumulative bill, statement and collection notice directed or sent to Plaintiff for Unit 2403 to Plaintiff from March of

2015 to December of 2016 that included any charge as listed herein and
above from March of 2014 to February 18 of 2015.

b.      Each bill, statement and collection notice directed or sent to Plaintiff for
Units 2403 and 2208 from March of 2015 to December of 2016 that
contained a non-contracted for:

- $2.16 "finance fee;"
- $15.00 "late fee;"
- A misc. credit collection letter fee.

c.      Each bill, statement and collection notice directed or sent to Plaintiff for
Units 2403 and 2208 from March of 2015 to December of 2016 that
contained a water charge and sewer charge that:

- Was marked up more than the actual rate charged by the
  local Orlando water utility providing servicing and
  billing the Solaire at the Plaza HOA;
- Allocated or apportioned more than the actual use of
  water and sewer charges for Units 2403 and 2208.

8.      As described herein, Defendant NES for almost two years knew the
intentionally false statements as described herein were false.

9.      As described herein, Defendant NES in making their intentionally false
statements intended that Plaintiff and Pew would rely on their false statements.

10.     Plaintiff relied on NES' false statements in making appropriate personal and
legal decisions.

11.     Plaintiff suffered losses and damages as a result of Defendant NES' false

statements as stated herein.

WHEREFORE, Plaintiff demands that a judgment for damages in his favor and against Defendants NES Fernando, Kunert, and Kunert Realty for his actual or statutory damages, whichever is greater; for punitive damages if allowable by law; for his attorney's fees and costs, and for any other relief the Court deems proper and just.

## XXVI. COUNT X. - - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO DEFENDANTS KUNERT, KUNERT REALTY, FERNANDO & NES

A.  Plaintiff incorporates herein by reference the facts and allegations made in the preceding and foregoing paragraphs, each prior Count as well as those facts stated below:

1.  NES' scandalous conduct as described herein and below was outrageous and NES used and abused its power and position of trust in unlawful, harassing and abusive collection attempts against the Plaintiff to collect unlawful, non-contracted for charges, fees and expenses created from fraudulent meter readings, billings, and allocation methods for water and sewer usage.

2.  The acts were targeted at Plaintiff and Pew an 87 year-old handicapped and disabled woman.

3.  NES' conduct was both intentional and reckless and despite numerous disputes, requests for information, and Plaintiff's evidence that he had no legal or debt obligation to NES, they ignored the fact that Plaintiff did not reside in Unit 2403 prior to February 18, 2015; fraudulently entered data and programmed their computerized billing system to reflect Plaintiff began occupying Unit 2403 in March of 2014; and refused for over two-years to fix and remediate the issues and disputes raised by Plaintiff and continued their annoyance, harassment and

abusive collection actions toward the Plaintiff.

4.      As evidenced by the Plaintiff's emails and communications, the acts of NES

        caused Plaintiff great emotional distress, restlessness, sleeplessness, anxiety,

        frustration and anger.

5.      Defendants Kunert, Kunert Realty, and Fernando's shocking and scandalous

        conduct as described herein in attempting to intimidate Plaintiff into paying

        fraudulently created bills and the known obligation of their prior tenant and

        occupant and then paying the fraudulently created bill and threatening to evict

        the Plaintiff and Pew an 87 year-old handicapped and disabled woman over

        $1000 approx. in known and admitted fraudulent bills after being paid over

        $57,500.00 in payment was outrageous and Defendants Kunert, Kunert Realty,

        and Fernando used and abused their power and position of trust in unlawful,

        harassing and abusive collection attempts against the Plaintiff to collect

        unlawful, non-contracted for charges, fees and expenses created from fraudulent

        meter readings, billings, and allocation methods for water and sewer usage.

6.      The acts were targeted at Plaintiff and Pew an 87 year-old handicapped and

        disabled woman.

7.      Defendants Kunert, Kunert Realty, and Fernando's conduct was both intentional

        and reckless and despite numerous disputes, requests for information, and

        Plaintiff's evidence that he had no legal or debt obligation to NES, they ignored

        the fact that Plaintiff did not reside in Unit 2403 prior to February 18, 2015;

        NES fraudulently entered data and programmed their computerized billing

        system to reflect Plaintiff began occupying Unit 2403 in March of 2014; and

        refused for over two-years to fix and remediate the issues and disputes raised by

Plaintiff and continued their annoyance, harassment and abusive collection actions toward the Plaintiff.

8.   As evidenced by the Plaintiff's emails and communications, the acts of each Defendant caused Plaintiff great emotional distress, restlessness, sleeplessness, anxiety, frustration and anger.

WHEREFORE, Plaintiff demands that a judgment for damages in his favor and against Defendants NES, Fernando, Kunert, and Kunert Realty for his actual or statutory damages, whichever is greater; for punitive damages if allowable by law; for his attorney's fees and costs, and for any other relief the Court deems proper and just.

## XXVII. COUNT XI. - - NEGLIGENT MISREPRESENTATION AS TO DEFENDANTS KUNERT, KUNERT REALTY, FERNANDO & NES

A.   Plaintiff incorporates herein by reference the facts and allegations made in the preceding and foregoing paragraphs, each prior Count as well as those facts stated below:

1.   If the Court find that the false statements and promises made to Plaintiff were unintentional, then Plaintiff pleads in the alternative that such false statements and promises were reckless, negligent and/or grossly negligent.

2.   As described herein, Defendants Kunert, Kunert Realty and Fernando intentionally and/or recklessly made false statements and promises to Plaintiff regarding:

   a.   The true ownership of Units 2403 and 2208;

   b.   Fernando's ability to enter into a modification and extension of the prior occupancy, lease and purchase option agreements reached with Plaintiff for Units 2403 and 2208 by Defendants Kunert and Kunert Realty;

c.    Agreeing to an automatic annual renewal for occupancy of 2403 and 2208;

d.    Agreeing to a mutual three-month notice requirement of any changes to Unit 2208 and agreement for Plaintiff to pay three-month's rent if Pew's health decline and living independence was no longer possible or her death;

e.    Agreeing to enter into a mortgage-finance arrangement with Plaintiff for Units 2403 and 2208 if the HOA changed its rules;

f.    Agreeing for the option of first refusal in the First Agreement for purchase.

3.    As described herein, Defendants Kunert, Kunert Realty and Fernando knew the intentionally false statements as described herein were false or should have known they were false when Kunert, Kunert Realty and Fernando made the false statements knowing that Plaintiff was without knowledge of their falsity.

4.    As described herein, Defendants Kunert, Kunert Realty and Fernando in making the false statements intended that Plaintiff and Pew would rely on the false statements.

5.    Plaintiff and Pew relied on Kunert, Kunert Realty and Fernando's false statements in making appropriate business, personal, living, expenditure and investment decisions.

6.    Plaintiff suffered losses and damages as a result of Kunert, Kunert Realty and Fernando's false statements as stated herein.

7.    As described herein, Defendant NES intentionally made false statements to

Plaintiff or should have known they were false regarding the amount of Plaintiff's alleged debt obligation related to water utility bills for Units 2208 and 2403 and specifically to:

a.      Plaintiff's personal obligation for water utility bills for Unit 2403 from March of 2014 to February 18, 2015 when Plaintiff occupied the unit including, but not limited to:

- Each $15.00 late fee and charged, assessed, billed and/or collected;

- Each $2.16 "finance fee" charged, assessed, billed and/or collected;

- Each varying misc fee for collection letter fee charged, assessed, billed and/or collected;

- Each varying charge for water charged, assessed, billed and/or collected;

- Each varying charge for sewer usage charged, assessed, billed and/or collected.

8.      As described herein, Defendant NES intentionally made false statements to Plaintiff or should have known they were false regarding the amount of Plaintiff's alleged debt obligation related to water utility bills for Units 2208 and 2403 and specifically to:

a.      Each subsequent cumulative bill, statement and collection notice directed or sent to Plaintiff for Unit 2403 to Plaintiff from March of 2015 to December of 2016 that included any charge as listed herein and

above from March of 2014 to February 18 of 2015.

b.   Each bill, statement and collection notice directed or sent to Plaintiff for Units 2403 and 2208 from March of 2015 to December of 2016 that contained a non-contracted for:

- $2.16 "finance fee;"

- $15.00 "late fee;"

- A misc. credit collection letter fee.

c.   Each bill, statement and collection notice directed or sent to Plaintiff for Units 2403 and 2208 from March of 2015 to December of 2016 that contained a water charge and sewer charge that:

- Was marked up more than the actual rate charged by the local Orlando water utility providing servicing and billing the Solaire at the Plaza HOA;

- Allocated or apportioned more than the actual use of water and sewer charges for Units 2403 and 2208.

9.   As described herein, Defendant NES for almost two years knew the intentionally false statement or should have known they were false as described herein were in fact false.

10.  As described herein, Defendant NES made false statements or should have known they were false intended that Plaintiff and Pew would rely on their false statements.

11.  Plaintiff relied on NES' false statements in making appropriate personal and legal decisions.

12.    Plaintiff suffered losses and damages as a result of Defendant NES' false statements as stated herein.

WHEREFORE, Plaintiff demands that a judgment for damages in his favor and against Defendants NES Fernando, Kunert, and Kunert Realty for his actual or statutory damages, whichever is greater; for punitive damages if allowable by law; for his attorney's fees and costs, and for any other relief the Court deems proper and just.

## XXVIII.    CLAIM FOR ATTORNEY'S FEES

A.    Due to the time constraints and limitations over the recent holiday season, Plaintiff had to file this action pro se. It is anticipated that Plaintiff will retain appropriate counsel to litigate the claims stated herein and/or will retain counsel from time-to-time to assist in the prosecution of this matter and will agree to pay such counsel for the services rendered.

B.    Thus, Plaintiff hereby requests an award for reasonable attorney's fees in the event he is the prevailing party pursuant to the provisions of state and Federal law.

## XXIX. DEMAND FOR JURY TRIAL

A.    Plaintiff demands a trial by jury for all causes of action.

## XXX.  CERTIFICATIONS

A.    Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the

complaint otherwise complies with the requirements of Rule 11.

B.  I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date:      January 6, 2017

Plaintiff:

ANEURIN ADLAI LAVALLE
424 East Central Blvd. #119
Orlando, FL 32801
mortgagefrauds@aol.com